**OUTTEN & GOLDEN LLP**
Nicholas H. Sikon
Shira Z. Gelfand
685 Third Avenue, 25th Floor
New York, New York 10017
Telephone: (212) 245-1000

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **LYNN RICHMOND,**<br><br>    **Plaintiff,**<br><br>        **v.**<br><br>**MONTEFIORE MEDICAL CENTER,**<br><br>    **Defendant.** | **COMPLAINT**<br><br>**<u>Demand for Trial by Jury</u>** |

**<u>NATURE OF THE ACTION</u>**

1.      Plaintiff Lynn Richmond ("Plaintiff" or "Ms. Richmond"), by and through her attorneys Outten & Golden LLP, brings this action against Defendant Montefiore Medical Center ("Montefiore" or the "Hospital") for breach of contract; violations of the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101 *et seq.* (the "NYCHRL"); violations of the New York State Human Rights Law, N.Y. Exec. Law §§ 296 *et seq.* (the "NYSHRL"); violations of the New York Labor Law, N.Y. Lab. Law §§ 190 *et seq.* (the "NYLL"); and, alternatively, promissory estoppel and breach of the implied covenant of good faith and fair dealing.

2.      Lynn Richmond is the former Executive Vice President, Chief Strategy Officer of Montefiore. On November 20, 2019, after nearly 20 years of dedicated and extremely successful performance, Montefiore abruptly fired Ms. Richmond without notice or cause. In firing Ms.

1

Richmond, Montefiore refused to honor its contractual obligations to her, specifically, its

promise under her employment agreement that she would be given two years of notice before

any such termination. Instead, Montefiore simply declared her contract null and void as it was

purportedly never approved by the Hospital's Compensation Committee. Montefiore's

declaration has no basis in law or fact, as the parties performed under the contract for more than

five years. Moreover, when Ms. Richmond inquired about the Compensation Committee's

approval at the time of the contract's formation, the Senior Vice President and Special Advisor

for Business Affairs, who served as staff to the Compensation Committee, informed Ms.

Richmond that he would "take care" of the Compensation Committee.

3.      Further, Montefiore's termination of Ms. Richmond's employment was

discriminatory on the basis of her gender in that similarly-situated male employees were not fired

or separated in such an abrupt, reputation-damaging manner, in clear violation of a notice

provision that would have prevented such negative perceptions of the termination. As a result of

Montefiore's breach of contract, gender discrimination, and other violations of law, Ms.

Richmond has suffered significant harm, including, but not limited to, loss of employment,

reputational damage, and millions of dollars in lost wages and benefits.

### THE PARTIES

**Plaintiff**

4.      Plaintiff Lynn Richmond is an adult woman and a former employee of Defendant

Montefiore Medical Center within the meaning of all applicable statutes.

5.      During her employment with Defendant, Ms. Richmond worked at Montefiore's

executive offices, located in the State of New York, Bronx County.

6.      Ms. Richmond currently resides in the State of Connecticut, New London County.

**Defendant**

      7.      Defendant Montefiore Medical Center is a New York-based, not-for-profit

corporation, consisting of several licensed hospitals, ambulatory care centers, doctor practices,

and other organizations within the State of New York, Bronx County.

      8.      Montefiore Medical Center is part of the Montefiore Health System, which in turn

is part of the Montefiore Medicine Academic Health System, which includes the Albert Einstein

College of Medicine.

      9.      During all relevant times, Montefiore Medical Center was Plaintiff's employer

within the meaning of all applicable statutes.

      10.      During all relevant times, Montefiore Medical Center employed Plaintiff in the

State of New York, Bronx County.

      11.      During all relevant times, Montefiore Medical Center had more than four (4)

employees.

## JURISDICTION AND VENUE

      12.      This Court has diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332

because there is complete diversity between the parties and the amount in controversy exceeds

$75,000.

      13.      Venue lies in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a

substantial part of the events or omissions giving rise to this action, including the unlawful

employment practices alleged herein, occurred within the Southern District of New York.

## FACTUAL ALLEGATIONS

**Background Information**

      14.      Plaintiff Lynn Richmond is a highly-successful, well-known, and respected

healthcare executive who worked for Defendant Montefiore Medical Center for nearly 20 years. She holds a Bachelor of Arts in Anthropology from the University of Michigan, a Bachelor of Nursing Science from Columbia University, and a Master of Nursing Science from Hunter College, City University of New York.

15.    Ms. Richmond first worked for the Hospital from 1990-1993 at Montefiore Rikers Island Health Services before going back to graduate school.

16.    She rejoined the Hospital part-time between 1999-2001, and then returned in 2003 as the Director of Clinical Affairs.

17.    Rising through Montefiore's ranks, Ms. Richmond was promoted first to Vice President, then to Senior Vice President, then to Executive Vice President, and then to Executive Vice President, Chief Strategy Officer.

18.    In or around May 2014, Ms. Richmond discovered that other executives at Montefiore – all male – had employment agreements and raised the possibility of her receiving an employment agreement with her supervisor, Dr. Steven Safyer, Montefiore's then Chief Executive Officer. Dr. Safyer agreed and directed her to work with Stanley Jacobson, who was previously Montefiore's General Counsel and at the time was Senior Vice President and Special Advisor for Business Affairs with responsibility for staffing and supporting Montefiore's Compensation Committee.

19.    Subsequently, Mr. Jacobson, working under the direction of Dr. Safyer, drafted Ms. Richmond an employment agreement ("the Employment Agreement").

**The Employment Agreement**

20.    The Employment Agreement provides, in relevant part, that Montefiore would employ Ms. Richmond in the capacity of Executive Vice President. *See* Exhibit A, July 1, 2014

4

Employment Agreement between Ms. Richmond and Montefiore (hereinafter "Exhibit A"), § 1.

21.     The Employment Agreement further provides that Montefiore could terminate Ms. Richmond's employment for "cause" with five (5) days' notice, so long as it "first provide[d] Richmond with a written notice enumerating the alleged misconduct." *See* Exhibit A, § 3B.

22.     Alternatively, the Employment Agreement provides that Montefiore could terminate Ms. Richmond's employment "at any time by giving Richmond written notice of such termination (the "Termination Notice" <u>*at least twenty-four (24) months prior to the effective date of the termination*</u>. The period commencing on the date of the Termination Notice to and including the effective date of the termination is referred to herein as the "Notice Period." *See* Exhibit A, § 3B (emphasis added).

23.     The purpose of the Notice Period was to provide Ms. Richmond with an opportunity to transition smoothly from her position, secure new employment, provide a guaranteed 24-months of compensation and benefits, and communicate about her departure in a manner that preserves her professional reputation.

24.     The Employment Agreement also provides that, "[n]otwithstanding any other provision of this Agreement or any policy or guideline of Montefiore, during the Notice Period Richmond shall continue to receive the Salary in effect on the date of the Termination Notice but shall not be entitled to participate in the Incentive Plan. In addition, subject to applicable law, Richmond shall receive benefits at the level in effect on the date of the Termination Notice." *See* Exhibit A, § 3B.

25.     The Employment Agreement is subject to and governed by the laws of the State of New York. *See* Exhibit A, § 11.

26.     On June 2, 2014, Mr. Jacobson emailed Ms. Richmond a draft of the Employment Agreement. In his June 2nd email, Mr. Jacobson noted that the Employment Agreement was "identical to the agreements with Phil [Ozuah] and Chris [Panczer]," Montefiore's then Chief Operating Officer and General Counsel respectively.

27.     That same day, Ms. Richmond responded to Mr. Jacobson's email and said she was "completely comfortable with the terms of the agreement."

28.     The following day, Ms. Richmond emailed Mr. Jacobson and asked him, with respect to the Employment Agreement, what they should do to prepare for Montefiore's Compensation Committee, a subcommittee of Montefiore's Board of Directors.

29.     On June 3, 2014, Mr. Jacobson emailed Ms. Richmond and stated that he would "take care of [the] Comp. Comm."

30.     On June 4, 2014, Mr. Jacobson again emailed Ms. Richmond and stated that the Compensation Committee "really has no role in this."

31.     Ms. Richmond's Employment Agreement was ultimately signed by Ms. Richmond and Dr. Safyer, with an effective date of July 1, 2014. *See* Exhibit A, Preamble.

32.     At no time prior to the termination of her employment did anybody ever raise to Ms. Richmond any concern regarding the enforceability of her Employment Agreement or tell her that the Compensation Committee had not approved it.

33.     Based on, among other things, the representations by Mr. Jacobson and others, and the fact that the parties operated under the terms of the Employment Agreement (*e.g.*, Ms. Richmond continued in the role of Executive Vice President and Montefiore paid her the contractually agreed-upon compensation and benefits), Ms. Richmond reasonably understood that her contract either had been or did not need to be approved by the Compensation

Committee.

**Montefiore Discriminates Against Ms. Richmond on the Basis of her Gender and Breaches her Employment Agreement by Terminating Her Employment Immediately Without Cause**

34.     While at Montefiore, Ms. Richmond played a critical leadership role in the organization's strategic growth and success. She became the point person for the identification of strategic opportunities and the negotiation of acquisitions and partnerships, including the acquisition of the Albert Einstein School of Medicine, several hospitals in Westchester, Rockland and Orange counties, and the Hospital's partnership with the largest physician group in the Hudson Valley. At the time of her eventual termination, she held a significant portfolio of responsibilities, including, but not limited to, responsibility for strategic planning, community relations, public relations, board relations, governmental affairs and public policy, community and population health, Montefiore's not-for-profit housing corporation, and one of New York State's largest and most successful Delivery System Reform Incentive Payment ("DSRIP") programs. She oversaw a team of over 70 people.

35.     Ms. Richmond's healthcare expertise is recognized inside and outside of Montefiore. In the months prior to her being fired, she was voted one of the 50-most important women in health care by Crain's Magazine. She delivered presentations around the country and represented Montefiore at national and local meetings and forums, including several boards of directors, the Healthcare Association of New York State, and the Westchester Business Association. She has been awarded recognitions from several community organizations, including, among others, Lifting UP Westchester and Bronx Accountable Healthcare Network. She frequently served as a spokesperson for Montefiore, speaking to the press on numerous occasions.

36.     During her employment with Montefiore, Ms. Richmond received excellent

performance reviews from Dr. Safyer and bonuses based on her exceptional performance. Her salary and bonuses were reviewed and approved annually by the Compensation Committee.

37.     Despite these successes, Ms. Richmond was forced to contend with being one of the few female executives at Montefiore. For the vast majority of her employment, she was one of the few female employees at the Senior Vice President level and above, and the only female Executive Vice President. Even today, of the 17 executives listed on Montefiore's website, only 5 are women.[1] Additionally, of the 21 Department Chairs listed on Montefiore's website, only 3 are women. It is indisputable that Montefiore is a male-dominated organization in its upper echelons.

38.     Additionally, over the course of her tenure, Ms. Richmond repeatedly observed inappropriate, sexually harassing, and discriminatory conduct at Montefiore, including, for example, references to sex, sexist jokes, requests that female employees rub male employees' shoulders, inappropriate touching, and belittling names for women.

39.     Upon information and belief, other women at Montefiore complained about this sexually harassing and discriminatory conduct, but Montefiore failed to take appropriate action in response.

40.     Male and female employees were also treated differently at Montefiore. For example, Ms. Richmond observed that Dr. Ozuah did not like it when female employees disagreed with or spoke back to him. When they did, Dr. Ozuah often developed negative views of these female employees, ceased supporting them, and excluded them from relevant meetings, seeking to push them out of the organization.

41.     Similarly, Dr. Ozuah embarrassed, belittled, or criticized Ms. Richmond and her

---

[1]     *See* https://www.montefiore.org/about-leadership (last visited on October 20, 2021).

female colleagues in a manner that contrasted sharply with the way he treated their male peers. On one such occasion, Dr. Ozuah went out of his way to embarrass Ms. Richmond while she was giving a presentation to the Board's Strategic Planning Committee. The Chairman of the Montefiore Health System asked Dr. Ozuah, not Ms. Richmond, a question about a slide in Ms. Richmond's presentation. Dr. Ozuah, instead of simply answering the question, proceeded to criticize, without merit, a related data point, causing Ms. Richmond to look unprepared in front of the Committee. On another occasion, during a Finance Committee meeting, Dr. Ozuah made a critical remark about Chief Financial Officer Colleen Blye's presentation in front of the Board members. After the meeting, Ms. Blye remarked, "what kind of colleague criticizes another in front of Board members." Ms. Richmond never observed Dr. Ozuah make any critical remarks during presentations by the previous Chief Financial Officer, Joel Perlman, who was male. On another occasion, in a meeting with all Vice Presidents and senior leadership, a woman who reported to Ms. Richmond delivered a presentation regarding DSRIP. Dr. Ozuah, in front of the entire room, insultingly asked her, "do you know what DSRIP stands for?"

42.     Dr. Ozuah also regularly tried to exert control over female employees by, among other things, hyper-scrutinizing their performance. Again, he did not do this with Ms. Richmond's similarly-situated male peers.

43.     In or around early 2018, Dr. Ozuah informed Dr. Safyer that he was leaving Montefiore and taking a job elsewhere. The Board became involved and Dr. Ozuah was issued a new contract that offered him a significant payout if following Dr. Safyer's departure he either was not made Chief Executive Officer or the Board decided to initiate a formal search with respect to the role.

44.     Around this same time, Dr. Ozuah increased his efforts to exert control over Ms.

Richmond. While the two of them were still peers reporting to Dr. Safyer, Dr. Ozuah invited Ms.

Richmond to attend his direct report meetings like one of his subordinates. During these

meetings, Dr. Ozuah kept the room very cold and required everyone to stand for about an hour,

even though women at these meetings wore less comfortable shoes and Ms. Richmond had

previously circulated an article about women having lower metabolic rates and therefore

experiencing cold more easily than men. Dr. Ozuah also asked each of his direct reports to

provide certain information to him after the meeting, and when Ms. Richmond did not, as she

was his peer, Dr. Ozuah scolded her for it.

45.     Dr. Ozuah was clear in his words and actions that he wanted Ms. Richmond to act

as though she reported to him. For example, on another occasion, he angrily told Ms. Richmond

that he did not want her acting as an "interloper" between him and Dr. Safyer, implying instead

that he wanted her under his wing. This made Ms. Richmond very uncomfortable as she reported

to the Chief Executive Offer and she could not meet her obligations to him if she allowed Dr.

Ozuah to control her. As was the case with other women who stood up to or refused to allow Dr.

Ozuah to control them, this caused him to develop a negative view of Ms. Richmond and target

her for removal.

46.     On or about November 14, 2019, Dr. Safyer's employment with Montefiore

ended. The following day, Dr. Ozuah stepped into the role of Chief Executive Officer.

47.     Around one week later, on November 20, 2019, Dr. Ozuah called Ms. Richmond

into his office where he was present with legal counsel and Freddy Cabrera, Montefiore's Chief

Human Resources Officer.

48.     The attorney, whom Ms. Richmond did not know, informed her that Montefiore

was terminating her employment immediately without cause and presented her with a letter

stating that the Employment Agreement was null and void as it was never approved by the Compensation Committee.

49.      Ms. Richmond asked whether she had done something wrong and Mr. Cabrera responded that Ms. Richmond "had done nothing wrong," that her employment was being terminated because Dr. Ozuah thought "there was a dark shadow over her head." The lawyer added, "you are not being fired for cause."

50.      To the extent the vague comment that Ms. Richmond had a "dark shadow over her head" implied she had any performance issues or had committed any wrongful acts, such an assertion is false and pretext for unlawful gender discrimination.

51.      No other executives, including any male executives at the Senior Vice President or Executive Vice President level, were fired at the same time as Ms. Richmond.

52.      Further, male employees at the executive vice president level and above who were previously exited were given 'soft' exits or 'glidepaths' which protected them financially and reputationally. For example, Joel Perlman, Chief Financial Officer, was asked to resign and given a two-year 'glidepath.' Similarly, the late Don Ashkenase, Executive Vice President, 'resigned' and then negotiated an agreement to continue working for the Hospital in a different capacity, reporting to Ms. Richmond. Additionally, Robert Conaty, Executive Vice President and Chief Operating Officer, retired earlier than he had originally planned and continued to work for the Hospital as a consultant. These 'soft' exits or 'glidepaths' allowed these male executives to control the messaging around their departures and preserved their professional reputations. Ms. Richmond, unlike her male colleagues, was never offered or afforded this benefit, even though she had raised it as a possibility to Dr. Safyer, Chris Panczer, and Dr. Ozuah in the summer immediately prior to her termination. Instead, the Hospital simply fired her without notice or

cause, declared her contract null and void, and ushered her out the door the same day as the

termination.

53.     The male executives who received 'soft exits' or 'glidepaths' also received going

away parties, which Ms. Richmond did not.

54.     At the time of Ms. Richmond's termination, the parties had performed under the

Employment Agreement for more than five years.

55.     At the time of Ms. Richmond's termination, her annual salary was approximately

$950,000.

56.     At the time of Ms. Richmond's termination, her benefits included, but were not

limited to, health insurance, dental insurance, life insurance, accidental death and disability

insurance, an annual 401K contribution, commuter benefits, PTO accrual, and deferred

compensation benefits in the form of participation in a pooled supplemental retirement plan (the

"SERP").

57.     As a result of the termination of her employment and the manner in which

Montefiore handled it, Ms. Richmond suffered significant harm, including, but not limited to, the

loss of her job, her salary, the aforementioned benefits, and significant annual incentive

payments.

58.     As a result of the termination of her employment and the manner in which

Montefiore handled it, Ms. Richmond also suffered severe emotional distress, including, but not

limited to, significant anxiety, depression, and social isolation. Her professional reputation has

been seriously harmed as a result and she has since struggled to obtain alternative employment.

**Montefiore Makes Unlawful Deductions from Ms. Richmond's Wages**

59.     As of the termination date, November 20, 2019, Ms. Richmond had

approximately three weeks of earned but unused "choice time," a pool of hours which includes vacation time.

60.     Upon information and belief, Montefiore, as a policy, pays out earned but unused choice time at the time of separation.

61.     To date, Montefiore has failed to pay Ms. Richmond her earned but unused choice time, including her vacation time.

62.     The failure to pay Ms. Richmond her earned but unused choice time, including her vacation time, was an unlawful deduction of wages.

63.     The deductions made from Ms. Richmond's wages were not expressly authorized by Ms. Richmond, nor were they for her benefit.

64.     The deductions made from Ms. Richmond's wages were not authorized or required by law.

65.     As a result of Montefiore's unlawful deductions, Ms. Richmond has suffered the loss of approximately three weeks of wages.

## FIRST CAUSE OF ACTION
### Breach of Contract

66.     Ms. Richmond re-alleges and incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

67.     On July 1, 2014, Ms. Richmond and Dr. Safyer, on behalf of Montefiore, entered into the Employment Agreement.

68.     The Employment Agreement constitutes a valid and enforceable contract between Ms. Richmond and Montefiore as a matter of New York law.

69.     Ms. Richmond and Montefiore performed their obligations under the Employment

Agreement for over five years before Montefiore breached the contract.

70.     Pursuant to the Employment Agreement, Montefiore was required to provide Ms. Richmond with 24 months of notice prior to the effective date of her termination.

71.     Montefiore breached its contract with Ms. Richmond by declaring the agreement void and terminating her employment without cause effective immediately, thereby failing to provide her with the contractually agreed-upon 24 months of written notice.

72.     As a result of Montefiore's breach, Ms. Richmond has suffered significant harm, including, but not limited to, the loss of two years of employment, compensation, and benefits.

73.     Ms. Richmond is entitled to damages in relation to this breach, including, but not limited to, compensation for the salary and benefits, including the SERP payments, that she would have received during the two-year notice period.

**SECOND CAUSE OF ACTION**
**Gender Discrimination in Violation of the**
**New York City Human Rights Law (N.Y.C. Admin. Code §§ 8-101 *et seq.*)**

74.     Ms. Richmond re-alleges and incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

75.     Ms. Richmond was an "employee" for the purposes of the NYCHRL.

76.     Montefiore was Ms. Richmond's "employer" for the purposes of the NYCHRL.

77.     Under the NYCHRL, it is unlawful to treat any employee "less well" in the terms and conditions of her employment because of her gender.

78.     Montefiore discriminated against Ms. Richmond by terminating her employment but not that of her similarly-situated male peers, thereby violating the NYCHRL.

79.     Montefiore further discriminated against Ms. Richmond in violation of the NYCHRL by immediately terminating her employment and not offering her a 'soft' exit or a

14

'glidepath' like her male peers.

80.     As a result of Montefiore's discriminatory termination, Ms. Richmond has

suffered significant harm, including, but not limited to, the loss of employment, millions of

dollars in lost compensation and benefits, including the SERP payments, and significant

reputational harm and emotional distress.

81.     Ms. Richmond is entitled to damages as a result of Montefiore's unlawful acts,

including, but not limited to, past and future lost wages and benefits, damages to compensate her

for reputational harm and past and future physical and emotional distress, punitive damages, the

reasonable attorneys' fees and the costs of this action, and pre-judgment interest.

### THIRD CAUSE OF ACTION
### Gender Discrimination in Violation of the
### New York State Human Rights Law (N.Y. Exec. Law §§ 296 *et seq.*)

82.     Ms. Richmond re-alleges and incorporates by reference the allegations contained

in the previous paragraphs of the Complaint as if fully rewritten herein.

83.     Ms. Richmond was an "employee" for the purposes of the NYSHRL.

84.     Montefiore was Ms. Richmond's "employer" for the purposes of the NYSHRL.

85.     Under the NYSHRL, it is unlawful to discriminate against any employee on the

basis of their gender by subjecting them to inferior terms, conditions, or privileges of

employment.

86.     Montefiore discriminated against Ms. Richmond by terminating her employment

but not that of her similarly-situated male peers, thereby violating the NYSHRL.

87.     Montefiore further discriminated against Ms. Richmond in violation of the

NYSHRL by immediately terminating her employment and not offering her a 'soft' exit or a

'glidepath' like her male peers.

88.     As a result of Montefiore's discriminatory termination, Ms. Richmond has

suffered significant harm, including, but not limited to, the loss of employment, millions of

dollars in lost compensation and benefits, including the SERP payments, and significant

reputational harm and emotional distress.

89.     Ms. Richmond is entitled to damages as a result of Montefiore's unlawful acts,

including, but not limited to, past and future lost wages and benefits, damages to compensate her

for reputational harm and past and future physical and emotional distress, punitive damages, the

reasonable attorneys' fees and the costs of this action, and pre-judgment interest.

**FOURTH CAUSE OF ACTION**
**Unlawful Deductions from Wages in Violation of the New York Labor Law**
**(N.Y. Lab. Law §§ 190 *et seq.*)**

90.     Ms. Richmond re-alleges and incorporates by reference the allegations contained

in the previous paragraphs of the Complaint as if fully rewritten herein.

91.     Ms. Richmond was an "employee" for the purposes of the New York Labor Law.

92.     Montefiore was Ms. Richmond's "employer" for the purposes of the New York

Labor Law.

93.     Ms. Richmond's earned but unused "choice time" including vacation pay are

"wages" as defined by Section 190(1) of the New York Labor Law.

94.     By failing to pay Ms. Richmond her earned but unused "choice time" including

vacation pay following her termination, Montefiore willfully and intentionally withheld,

underpaid, or made an unlawful deduction from Mr. Richmond's wages, in violation of N.Y.

Lab. Law § 193.

95.     The deductions made from Ms. Richmond's wages were not in good faith, were

not expressly authorized by Ms. Richmond, and were not for her benefit or required by law.

96.     As a result of Montefiore's willful violations, Ms. Richmond is entitled to recover

from Montefiore approximately three weeks of wages, as well as liquidated damages in the

amount of 100%, pre- and post-judgment interest at the highest rate permitted by law, and

reasonable attorneys' fees and costs.

## FIFTH CAUSE OF ACTION
### Alternatively, Promissory Estoppel

97.     Ms. Richmond incorporates by reference the allegations contained in the previous

paragraphs of the Complaint as if fully rewritten herein.

98.     Defendant Montefiore promised to provide Ms. Richmond with 24 months of

notice prior to terminating her employment without cause.

99.     Ms. Richmond reasonably relied on Defendant Montefiore's promise to her

detriment by, among other things, continuing her employment with Montefiore and/or foregoing

other employment opportunities.

100.    On November 20, 2019, Defendant Montefiore reneged on its promise to Ms.

Richmond and fired her immediately without cause.

101.    As a result of Ms. Richmond's reliance on Defendant Montefiore's promise, she

has suffered damages, including, but not limited to, the loss of the 24-month notice period.

## SIXTH CAUSE OF ACTION
### Alternatively, Breach of the Implied Covenant of
### Good Faith and Fair Dealing

102.    Ms. Richmond incorporates by reference the allegations contained in the previous

paragraphs of the Complaint as if fully rewritten herein.

103.    The Employment Agreement is governed by New York law.

104.    Under New York law, every contract contains an implied covenant of good faith

and fair dealing.

105.     The covenant of good faith protects parties to a contract from being deprived of the benefit of their bargain by certain actions of another party.

106.     Upon information and belief, Defendant Montefiore terminated Ms. Richmond's employment and unilaterally declared the Employment Agreement invalid so as to also avoid having to comply with the Notice Period.

107.     Montefiore's actions were taken in bad faith for the purpose of depriving Ms. Richmond of the benefits of the Employment Agreement.

108.     Montefiore's actions deprived Ms. Richmond of the right to receive compensation and benefits due to her under her contract.

109.     Ms. Richmond is entitled to damages in relation to this breach, including, but not limited to, compensation for the salary and benefits, including the SERP payments, that she would have received during the Notice Period.

### PRAYER FOR RELIEF

**WHEREFORE**, Ms. Richmond seeks the following relief:

A.  A declaration that the acts, practices, and omissions complained of herein are unlawful and violate the NYCHRL, the NYSHRL, the NYLL, and state contract law;

B.  Reinstatement;

C.  Back pay and front pay for past and future lost wages and benefits;

D.  Compensatory damages for, among other things, reputational harm, emotional distress, and the loss of employment, compensation, and benefits during the Notice Period;

E.  Punitive damages;

F.  Liquidated damages;

G.  Pre-judgment interest (continuing to accrue at a rate of 9% per year);

H.  Post-judgment interest;

I.  The reasonable attorneys' fees and costs of this action; and

J.  Such other and further relief as this Court shall deem just and proper.

## **DEMAND FOR TRIAL BY JURY**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Ms. Richmond demands a

trial by jury on all questions of fact raised by the Complaint.


Dated:  New York, New York
      October 22, 2021

Respectfully submitted,

**OUTTEN & GOLDEN LLP**
Nicholas H. Sikon
Shira Z. Gelfand
685 Third Avenue, 25th Floor
New York, New York 10017
Telephone: (212) 245-1000
Email: nsikon@outtengolden.com
Email: sgelfand@outtengolden.com

***Attorneys for Ms. Richmond***