UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LYNN RICHMOND,

                    Plaintiff,

     - against -

MONTEFIORE MEDICAL CENTER,

                    Defendant.

**MEMORANDUM
OPINION & ORDER**

21 Civ. 8700 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

       In this action, Plaintiff Lynn Richmond alleges claims for breach of contract, promissory estoppel, and violation of the New York State Human Rights Law (the "NYSHRL"), N.Y. Exec. Law § 296, et seq., and the New York City Human Rights Law (the "NYCHRL"), N.Y.C. Admin. Code § 8-101, et seq. against Defendant Montefiore Medical Center ("Montefiore" or the "Hospital").  Richmond served as the Hospital's chief strategy officer and as chief of staff to its chief executive officer until a new CEO arrived in November 2019.  The new CEO fired Richmond and the Hospital refused to pay her the 24 months' severance provided for in her employment agreement, contending that the severance payment had not been authorized by the Compensation Committee of the Hospital's Board of Trustees.

       The parties have cross-moved for summary judgment on Richmond's breach of contract claim, and the Hospital has also moved for summary judgment on Richmond's promissory estoppel and discrimination claims.  (Dkt. Nos. 78, 92)  In a September 21, 2023 order, this Court denied the parties' motions, set a trial date, and set a schedule for motions in limine, proposed voir dire, and requests to charge.  (Dkt. No. 123)  The purpose of this opinion is to explain the Court's reasoning for its denial of the parties' summary judgment motions.

# BACKGROUND[1]

Plaintiff is a citizen of Connecticut, and Defendant is a New York not-for-profit corporation that operates hospitals in the Bronx and elsewhere.  Jurisdiction is premised on diversity of citizenship, pursuant to 28 U.S.C. § 1332.  (Cmplt. (Dkt. No. 1) ¶¶ 4-12; Pltf. R. 56.1 Stmt. (Dkt. No. 97) ¶ 2)

## I.     FACTS

### A.     Richmond's Tenure at the Hospital

Richmond is a registered nurse.  She worked at the Hospital from 1990 to 1993, and then again from 1999 until her termination on November 20, 2019.  (Pltf. R. 56.1 Stmt. (Dkt. No. 97) ¶¶ 1, 3-10, 15)  "In 2012, Ms. Richmond was promoted to the position of Senior Vice President and Chief of Staff, and in 2014 to the position of Executive Vice President, Chief of Staff. . . . [T]hereafter, her title was changed to Executive Vice President, Chief Strategy Officer," which was her role when she was fired.  (Id. ¶ 10; Def. R. 56.1 Stmt. (Dkt. No. 82) ¶ 18)

---

[1]  To the extent that this Court cites facts drawn from a movant's Local Rule 56.1 statement, it has done so because the opposing party has either not disputed those facts or has not done so with citations to admissible evidence.  See Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted.") (citations omitted).  Where the opposing party disagrees with the movant's characterizations of the cited evidence, and has presented an evidentiary basis for doing so, the Court relies on the opposing party's characterization of the evidence.  Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001) (court must draw all rational factual inferences in non-movant's favor in deciding summary judgment motion).

The parties have made many evidentiary objections to each other's Local Rule 56.1 statements. The Court addresses below only those objections that relate to evidence discussed in this opinion.  In resolving the parties' motions, this Court has relied exclusively on evidence that would be admissible at trial.  See Fed. R. Civ. P. 56(c).

"In [her executive vice president] roles, Ms. Richmond was responsible for developing and implementing strategies for short- and long-term growth of the organization.  She also developed and led organization-wide strategic planning efforts, identified and pursued new business opportunities, investigated diversification into new businesses or service lines, identified and executed strategic alliances, joint ventures and partnerships, . . . led mergers, acquisitions, and divestitures," and was "responsible for oversight of [the Hospital's relations with its] Board of Trustees."  (Pltf. R. 56.1 Stmt. (Dkt. No. 97) ¶ 11; Def. R. 56.1 Cntrstmt. (Dkt. No. 105) ¶ 11)

Throughout her time at the Hospital, Richmond worked closely with Dr. Steven Safyer, who served as the Hospital's chief executive officer from 2007 to November 2019. Richmond describes CEO Safyer as a "mentor" and "supporter," and in a February 2018 email to him, Richmond states, "as you know, I will not be able to stay after you retire."  (Def. R. 56.1 Stmt. (Dkt. No. 82) ¶¶ 3, 9, 14-16)

At the time of Richmond's termination, her base salary was approximately $1.1 million per year.  (Id. ¶ 12)

### B.  Richmond's Contract and the Hospital's Approval of Executives' Employment Agreements

#### 1.  Safyer's Role with Respect to Employment

Montefiore's bylaws – which refer to the Hospital as the "Corporation," and to the CEO as the "President" – provide as follows:

> The Board of Trustees shall appoint a President who shall be the chief executive officer of the Corporation.
>
> . . . .
>
> The President shall be continuously responsible for the management of the Corporation and shall see that all orders and resolutions of the Board of Trustees are carried into effect, all consistent with the legal and professional requirements

governing the operation of the Corporation.  The authority and responsibility of the President shall include, but shall not be limited to . . . [c]arrying out all policies established by the Board and advising on the formation of these policies. . . . [and] [s]electing, employing, controlling and discharging employees and developing and maintaining personnel policies and practices for the Corporation.

. . . .

In all cases of disputed authority or disputed interpretation as to these Bylaws, or the Bylaws of the Medical Staff, the decision of the President shall govern unless and until the Board shall determine otherwise.

(Gerson Decl., Ex. 19 (Feb. 2014 Montefiore Bylaws) (Dkt. No. 83-19) at 58, 60, 62)[2]

### 2.    The Compensation Committee

The Hospital's Board of Trustees has a Compensation Committee.  The Hospital's

bylaws describe the Committee's duties as follows:

The Compensation Committee has been delegated, by the Board of Trustees, the authority and responsibility for reviewing, and recommending for approval by [the Corporation's sole member, Montefiore Health System, Inc. (the "Member")], compensation policies, base salary and incentive compensation levels, executive retirement and other executive benefit plans for selected senior management of the Corporation who are defined as "Disqualified Persons" by IRS Intermediate Sanctions regulations.  The policies and programs reviewed by the Compensation Committee, and recommended for approval by the Member, are designed to ensure that the Corporation remains competitive and reasonable relative to the compensation and benefits practices of similarly situated institutions locally and nationally, and to permit the Corporation to attract and retain superior senior management.  The Compensation Committee shall review, and recommend for approval by the Member, the compensation packages for senior management of the Corporation.  The Chair of the Committee shall report to the Board of Trustees at least annually regarding activities and process of the Committee.

The Compensation Committee shall adopt a charter and executive compensation philosophy statement that are consistent with best practices for hospital facilities that are exempt from taxation under Section 501(c)(3) of the [Internal Revenue] Code.

---

[2] Except for deposition transcripts, the page numbers of documents referenced in this opinion correspond to the page numbers designated by this District's Electronic Case Files ("ECF") system.  Deposition page numbers refer to the pagination assigned by the court reporter.

(Gerson Decl., Ex. 19 (Feb. 2014 Montefiore Bylaws) (Dkt. No. 83-19) at 52-54)

"[N]either the CEO nor any other employee of Montefiore was a member of the Compensation Committee." (Def. R. 56.1 Stmt. (Dkt. No. 82) ¶ 25) Some Montefiore employees regularly attended Compensation Committee meetings as "support staff," however. In 2013 and 2014, the "support staff" included CEO Safyer and Stanley Jacobson, a former Montefiore general counsel whose role at that time was "[Senior Vice President], Special Advisor for Business Affairs." (Def. R. 56.1 Stmt. (Dkt. No. 82) ¶¶ 46-47)

### a.   <u>Charter and Executive Compensation Philosophy Statement</u>

At an October 8, 2013 meeting – and as directed by the Hospital's bylaws – the Compensation Committee adopted a charter and executive compensation philosophy statement. (Def. R. 56.1 Stmt. (Dkt. No. 82) ¶¶ 30) Safyer and Jacobson attended the meeting. (Gerson Decl., Ex. 20 (Oct. 8, 2013 Comp. Comm. Meeting Minutes) (Dkt. No. 84-6) at 3) The charter and philosophy statement were prepared by the Hospital's external compensation consultant, SullivanCotter. (Def. R. 56.1 Stmt. (Dkt. No. 82) ¶ 40) The charter approved at the October 8, 2013 meeting provides as follows:

### I.   PURPOSE

The Committee is fully authorized to act on the Board's behalf to discharge the responsibilities of the Board with respect to Montefiore's senior executive compensation programs, including (i) determining appropriate compensation levels for Montefiore's selected senior management (hereafter "executives") and other disqualified persons[FN1] [FN2]; (ii) evaluating executives' and other disqualified persons' compensation plans, policies, and programs; (iii) reviewing benefit plans for executives and other disqualified persons; and (iv) verifying that compensation information is appropriately and fully disclosed. These responsibilities are further described in Section VII.

. . . .

[FN1] Such as highly compensated physicians who may qualify as disqualified persons.

FN2 Definition of a disqualified person: . . . any person who was in a position to exercise substantial influence over the affairs of the applicable tax-exempt organization.

. . . .

## VI.    PROCESS FOR CONSIDERING AND APPROVING EXECUTIVE COMPENSATION

It is essential that the Committee's process for considering and approving compensation arrangements for the executives, and in particular for the CEO, is in compliance with applicable federal tax and New York State laws and regulations, including, without limitation, (a) the "rebuttable presumption procedure" set forth in the applicable Treasury Regulations issued under the "Intermediate Sanctions" provisions of the Internal Revenue Code, (b) Sections 515(b) and 715 of the New York Not-for-Profit Corporation Law, and (c) the regulations issued under New York State Executive Order 38.

Therefore, the Committee will have the following process in considering and approving compensation arrangements for executives:

1. The Committee, which will consist entirely of independent trustees who do not have a conflict of interest with respect to any compensation arrangement under consideration, will approve in advance the compensation of the executives, without any executive present during the deliberation or vote on his or her compensation.

2. The Committee will obtain and rely upon appropriate data as to comparable compensation arrangements, with appropriate data consisting of information sufficient to determine whether each compensation arrangement in its entirety is reasonable, and including, but not limited to, compensation levels paid by similarly situated organizations, both taxable and tax-exempt, for functionally comparable positions, the availability of similar services in the New York Metropolitan area, current compensation surveys compiled by independent consulting firms, and actual written offers from similar organizations.

3. The Committee will adequately and contemporaneously document the basis for its approval in meeting minutes.

## VII.    COMPENSATION COMMITTEE KEY RESPONSIBILITIES

The following responsibilities are set forth as a guide with the understanding that the Committee may divert from this list as appropriate given the circumstances. The Committee is authorized to carry out these and other such responsibilities assigned by the Board from time to time, and take any actions reasonably related to the mandate of this Charter.

To fulfill its purpose, the specific duties and responsibilities of the Committee will include:

1. Establishing, reviewing and modifying, as appropriate, the overall executive compensation philosophy of Montefiore, with the philosophy to be presented to the Board for review and ratification by independent trustees who do not have a conflict of interest.

2. Ensuring the orientation of new Committee members, by providing new members with a description of their role and responsibilities, as well as a description of Montefiore's executive compensation programs, executive compensation philosophy and its Charter.

3. Reviewing and approving organizational and individual goals, objectives and accomplishments relevant to assessing the CEO's and other executive's compensation.

4. Evaluating the performance of the CEO against approved organizational and individual goals, and in light of organizational and individual accomplishments, and determining and approving the CEO's compensation levels based on this evaluation.

5. Reviewing the CEO's recommendations for the compensation of other executives.

6. Engaging independent, outside advisors (e.g., attorneys, compensation consultants, etc.) to provide objective and impartial compensation data and advice for the Committee's executive compensation decision-making.

7. Reviewing on a periodic basis Montefiore's executive compensation programs to determine whether they are properly coordinated and achieve their intended purpose, and approve any appropriate modifications or new programs.

8. Reviewing, developing and approving any changes in executive benefits and/or employment agreement/severance provisions.

9. Administering Montefiore's executive compensation programs in a manner consistent with Montefiore's Executive Compensation Philosophy Statement, corporate governance best practices, and applicable federal tax and New York State law and regulations.

10. Reporting regularly to the full Board on Committee findings and actions, and any other matters the Committee deems appropriate or as the Board requests.

11. Maintaining complete documentation of Committee decisions and processes relating to executive compensation matters in minutes or other records of Committee meetings and activities.

(Sikon Decl., Ex. 7 (Oct. 2013 Comp. Comm. Charter) (Dkt. No. 99-4) at 19, 21-23 & nn.1-2 (emphases in original))

"The Philosophy Statement's key principles include:  to '[e]nsure that all executive compensation decisions are reviewed and approved by a Committee consisting of independent trustees who have no financial interest in compensation decision nor any conflicts of interest . . .'; to '[e]nsure that all executive compensation decisions are reasonable in relation to marketplace practices . . .', and to '[e]nsure that the Committee, when approving the compensation of the executives having substantial influence within Montefiore, establishes the 'rebuttal presumption of reasonableness' under applicable federal tax law and regulations and approves such compensation in accordance with the applicable provisions of the regulations issued under New York State Executive Order 38 and New York State Not-for-Profit Corporation Laws.'"  (Def. R. 56.1 Stmt. (Dkt. No. 82) ¶ 39 (quoting Gerson Decl., Ex. 17 (Exec. Comp. Philosophy Stmt.) (Dkt. No. 84-5) at 16) (brackets in Def. R. 56.1 Stmt.))

**b.**     **The Compensation Committee's Contract Approval Practices**

The parties dispute whether, in practice, the Compensation Committee approved employment agreements.  John Heffer, a Hospital trustee who "has been a member of the Compensation Committee from the date of its inception until [the] present" (Pltf. R. 56.1 Stmt. (Dkt. No. 97) ¶ 30) testified at deposition that "We don't approve the agreement.  We review the reasonableness opinion from [SullivanCotter]."  (Heffer Dep. (Dkt. No. 96-8) at 255:9-12)  Based on Heffer's testimony, Plaintiff argues that "the Compensation Committee has never approved employment agreements."  (Pltf. R. 56.1 Stmt. (Dkt. No. 97) ¶ 35)  The Hospital contends, however, that (1) the Compensation Committee's review of SullivanCotter's

"reasonableness opinions" – i.e., documents "presenting [SullivanCotter's] opinion on the reasonableness of an executive's proposed total compensation" (Def. R. 56.1 Stmt. (Dkt. No. 82) ¶ 41) – amounts to "approval" of the employment agreements; and (2) the Compensation Committee has reviewed the terms of executives' employment agreements in the past.  (Def. Cntrstmt. (Dkt. No. 105) ¶ 35 (noting that the Compensation Committee reviewed the terms of then-Chief Operating Officer (now CEO) Dr. Philip Ozuah's contract in October 2011, and that CEO Safyer summarized Chief Human Resources Officer Alfredo Cabrera's employment agreement for the Compensation Committee in October 2012))

It is undisputed that CEO Safyer signed multiple employment agreements with executives without the Compensation Committee's prior approval, including the employment agreements of General Counsel Chris Panczner, Chief Financial Officer Colleen Blye, and Chief Academic Officer Dr. Gordon Tomaselli.  (Pltf. R. 56.1 Stmt. (Dkt. No. 97) ¶¶ 42, 44-46) Panczner's contract included a 12-month severance provision, Blye's contract included a 24-month notice provision, and Tomaselli's contract included severance equal to his pay for "the longer of 12 months or the remainder of time on his 36-month contract term."  (Id. ¶¶ 42, 44, 45)

Plaintiff also notes that in July 2019, SullivanCotter prepared a "best practices document . . . as a prospective approach" for Hospital trustee and Compensation Committee member Heffer.  In correspondence to Heffer regarding this "best practices document," a SullivanCotter employee states that "there is often a process for the Committee to review/approve general/special terms for . . . executives [other than the CEO]," and states that "best practice would indicate that this comes before the final agreement has been extended for a new hire.  There should be coordination between legal, HR, and the consultant to effectively apprise the Committee, and seek approval as required by the Committee."  Plaintiff contends that

this correspondence and the preparation of a "best practices" manual for Heffer in July 2019

indicate that the Compensation Committee had not – up to that time – prospectively approved

employment agreements.  But the Hospital points out that "[t]he referenced memorandum did not

review or comment on Montefiore's [then-]existing policies," and therefore disputes Plaintiff's

inference.  (Pltf. R. 56.1 Stmt. (Dkt. No. 97) ¶¶ 36-37; Def. R. 56.1 Cntrstmt. (Dkt. No. 105) ¶

37; Sikon Decl., Ex. 29 (July 2019 Heffer/SullivanCotter email thread) (Dkt. No. 99-29) at 2-3)

### 3.     Severance Provisions at Montefiore

The parties dispute the types of severance provisions that were typical in

Montefiore executives' contracts, as well as the industry standard for such provisions.

Montefiore cites a 2012 SullivanCotter reasonableness opinion regarding

Richmond's compensation as CEO Safyer's chief of staff.  Under the heading "[e]xecutive

benefits," SullivanCotter describes Montefiore's standard severance provision for executives as

follows:  "If terminated by employer other than for cause, notice (in lieu of severance) of up to

12 months base salary and benefits continuation is provided."  (Def. R. 56.1 Stmt. (Dkt. No. 82)

¶ 54; Gerson Decl., Ex. 6 (Oct. 2012 Richmond Reasonableness Opinion) (Dkt. No. 84-1) at 7

(emphasis in original))[3]  The document goes on to state that "[n]otice of termination (in lieu of

severance) of one year is consistent with market practice.  For senior executives of comparable

---

[3]  Richmond contends that this language does not describe the severance policy for executives, but instead addresses severance payments for "'all eligible [Montefiore] employees.'"  (Pltf. R. 56.1 Cntrstmt. (Dkt. No. 113) ¶ 54 (quoting Gerson Decl., Ex. 6 (Oct. 2012 Richmond Reasonableness Opinion) (Dkt. No. 84-1) at 6))  Richmond is mistaken.  The language Richmond relies on is from a a different table that appears earlier in the same document.  As stated above, the heading for the reasonableness opinion's description of the Hospital's severance policy refers to "[e]xecutive benefits."  (Gerson Decl., Ex. 6 (Oct. 2012 Richmond Reasonableness Opinion) (Dkt. No. 84-1) at 7)

organizations, severance period is typically 12 months and typically includes base salary, health benefits and outplacement assistance." (Id. at 8)

But Richmond notes – and Montefiore does not dispute – that (1) Ozuah's 2011 contract as Chief Operating Officer contains a 36-month severance provision, and (2) as mentioned, Blye's contract as Chief Financial Officer – which was signed in 2016 – contains a 24-month severance provision. (Pltf. R. 56.1 Stmt. (Dkt. No. 97) ¶¶ 43-44) As to industry standards, Richmond has proffered that from 2014 to 2018, SullivanCotter made annual presentations to the Compensation Committee in which it repeatedly stated that (1) the "[m]arket [p]ractice" for "[s]everance periods" for "senior executives [other than the CEO]" was "12 months to 24 months, with 12 months [being the] most common"; (2) "[t]he 36-month severance period for Dr. Ozuah is at the upper end of typical contemporary market practice, with 24 months being more common"; and (3) "[w]hile the notice of termination arrangements for other executives [at Montefiore] is a minority practice, the length of the period is consistent with market practice for length of severance period." (Sikon Decl., Ex. 32 (Nov. 2014 Comp. Comm. Presentation) (Dkt. No. 99-23) at 18, 63; see Pltf. R. 56.1 Stmt. (Dkt. No. 97) ¶¶ 94-98 (citing the same language in presentations through 2018))

### 4.    Richmond's Draft Employment Agreement

"In [May] 2014, around the time Ms. Richmond was elevated to her Executive Vice President, Chief of Staff position, she approached Montefiore's then-President and CEO, Dr. Steven Safyer, and requested a written agreement to govern the terms of her continued employment. She asked for a written agreement because she knew at the time that many if not most of the C-Suite executives had written agreements governing their employment with the Hospital," but she did not. "For example, she knew that General Counsel Chris Panczner, [then-]Chief Operating Officer Dr. Philip Ozuah, former Chief Financial Officer Joel Perlman, Stanley

Jacobson, former Executive Vice President – Corporate Donald Ashkenase, and former Chief

Operating Officer Robert Conaty all had written agreements with the Hospital."  CEO Safyer

directed Richmond and Special Advisor for Business Affairs Jacobson to prepare the contract.

(Pltf. R. 56.1 Stmt. (Dkt. No. 97) ¶¶ 39-40, 53; Def. R. 56.1 Stmt. (Dkt. No. 82) ¶ 55)[4]

On June 2, 2014, Jacobson emailed Richmond a draft employment agreement,

stating:  "Attached is a draft of your employment agreement.  It is identical to the agreements

with [Chief Operating Officer] Phil [Ozuah] and [General Counsel] Chris [Panczner].  Call me

after you review it."  (Gerson Decl., Ex. 25 (June 2, 2014 Jacobson email) (Dkt. No. 83-25) at 2)

The attached draft employment agreement includes, inter alia, the following terms:

**EMPLOYMENT**

Montefiore hereby agrees to continue Richmond's employment and Richmond
agrees to continue to be employed in the capacity of Senior Vice President and
Chief of Staff.  In such capacity, Richmond shall report to the President and Chief
Executive Officer of Montefiore and shall perform the duties and carry out the
responsibilities set forth on Exhibit A annexed hereto.  During her employment
hereunder, Richmond shall serve Montefiore diligently and to the best of her
ability.  Richmond's employment hereunder shall continue unless and until
terminated by Montefiore pursuant to the provisions of Section 3 hereof.

**COMPENSATION**

(a) For all services performed by Richmond hereunder, Montefiore shall pay
Richmond an annual salary of Six Hundred Twenty Five Thousand
($625,000) dollars (the "Salary").  The Salary shall be payable in accordance
with Montefiore's standard practices from time to time in effect.  Richmond
shall be eligible for increases in the Salary based upon the same criteria as are,
from time to time, generally, in effect for other members of senior
management of Montefiore.

(b) Richmond shall be entitled to participate in Montefiore's Annual Incentive
Plan for Senior Executives, as the . . . same may be determined, from time to
time, by the Compensation Committee of the Board of Trustees of Montefiore

---

[4]  The parties dispute whether CEO Safyer authorized Jacobson to determine the terms of
Richmond's employment agreement, or whether Safyer himself specified the terms of the
agreement.  (Pltf. R. 56.1 Stmt. (Dkt. No. 97) ¶ 53; Def. R. 56.1 Cntrstmt. (Dkt. No. 105) ¶ 53)

(the "Incentive Plan").  Anything herein contained to the contrary notwithstanding, Richmond shall not be entitled to compensation under the Incentive Plan if this Agreement is terminated for "Cause" (as such term is defined in Section 3(b) hereof) prior to the end of the year based upon which such annual incentive would be calculated. . . .

(c) Richmond shall be entitled to participate in Montefiore's Pooled Supplemental Retirement Plan for Senior Executives (the "SERP") effective as of _____.

(d) Montefiore shall reimburse Richmond for reasonable expenses incurred in the performance of her duties hereunder.  Reimbursement for expenses is subject to reasonable requirements with respect to substantiation and documentation.

(e) During the term hereof, except as provided in Section 3, Richmond shall be entitled to all benefits generally accorded to members of the senior management of Montefiore.

**TERMINATION AND TERMINATION BENEFITS**

Richmond's employment hereunder shall terminate under the following circumstances:

(a) In the event of Richmond's death, Richmond's employment shall terminate on the date of her death.  All compensation and Benefits earned by Richmond but unpaid at the time of her death, including compensation pursuant to the Incentive Plan and accrued but unused Choice Time (as such term is defined in Montefiore's policies and procedures) shall be paid to Richmond's estate or designated beneficiary, as appropriate.

(b) Richmond's employment may be terminated for "Cause" as defined below.  "Cause" shall mean:  (i) material failure to perform her duties hereunder (other than by reason of disability); (ii) material breach of this Agreement; (iii) Richmond's exclusion from participation in the Medicare, Medicaid or other governmental programs; or (iv) conviction (or a plea of [nolo] contendere) of a crime involving acts of moral turpitude, theft, misappropriation of funds or unlawful business conduct.  In the event Montefiore seeks to terminate Richmond for "Cause," it shall first provide Richmond with a written notice enumerating the alleged misconduct.  Richmond's employment shall terminate on the fifth day following the date of the aforesaid notice.

(c) Montefiore may terminate Richmond's employment at any time by giving Richmond written notice of such termination (the "Termination Notice" at least twelve (12) months prior to the effective date of the termination.  The period commencing on the date of the Termination Notice to and including the effective date of the termination is referred to herein as the "Notice Period."

Notwithstanding any other provision of this Agreement or any policy or guideline of Montefiore, during the Notice Period Richmond shall continue to receive the Salary in effect on the date of the Termination Notice but shall not be entitled to participate in the Incentive Plan.  In addition, subject to applicable law, Richmond shall receive benefits at the level in effect on the date of the Termination Notice.

In the event that during the Notice Period, Richmond accepts employment or performs services as an independent contractor with or for a person or entity other than Montefiore ("Other Employment"), the amount of compensation payable to Richmond by Montefiore shall be reduced dollar for dollar by any compensation paid to or accrued by Richmond from such Other Employment.  Richmond shall cause[] to be furnished to Montefiore within ninety (90) days following the end of the Notice Period, a statement prepared by an independent certified public accountant setting forth all compensation due to Richmond from such Other Employment during the Notice Period whether or not such compensation was actually paid during the Notice Period.  Richmond shall reimburse Montefiore promptly for an amount equal to the other compensation.

(Gerson Decl., Ex. 25 (June 2, 2014 Draft Richmond Employment Agmt.) (Dkt. No. 83-25) at 3-5 (emphases in original))

Under the draft employment agreement, if Richmond was terminated without cause, she would be entitled to twelve months' salary, less the income she earned from other employment during that same period.

Richmond replied to Jacobson that same day, approving the draft agreement. Over the next three days, she and Jacobson exchanged the following emails:

Richmond:

Stan,

I am completely comfortable with the terms of the agreement.  My father would be happy I was doing this.  Should this be effective once the change to EVP happens in July?  If you agree, we would of course need to change the language.

Thanks for your follow-up and more importantly, your support.

Best,

Lynn

Jacobson:

I would make the agreement effective July 1 and change your title.

Richmond:

Thanks.

What do we need to do to prepare for comp comm and [Montefiore] [M]edicine?

Jacobson:

I will take care of Comp. Comm.  Not sure what you mean about Montefiore Medicine

Richmond:

[S]etting up [M]ontefiore [M]edicine structure so [Ozuah] is president of [Montefiore Health System]?  [A]nd the rest of us are in [M]ontefiore [M]edicine.

Jacobson:

I have asked [General Counsel] Chris [Panczner] to set up a conversation among the 3 of us to discuss.  The Comp. Comm. really has no role in this.

Richmond:

Ok I thought we wanted to present this month.

My confusion.

(Gerson Decl., Ex. 26 (June 2-4, 2014 Richmond/Jacobson Email Thread) (Dkt. No. 83-26) at 2 (emails reordered))

"On June 8, 2014, Mr. Jacobson emailed Ms. Richmond a 'final version' of the agreement, which included both the 12-month notice provision and the Mitigation Provision." (Def. R. 56.1 Stmt. (Dkt. No. 82) ¶ 63)  This draft of Richmond's employment agreement is unsigned, and there is no signed version in the record.  (Gerson Decl., Ex. 27 (Dkt. No. 83-27))

15

5.     **The June 24, 2014 Board of Trustees Meeting**

On June 24, 2014, Richmond attended a meeting of Montefiore's Board of Trustees. At that meeting, General Counsel Panczner presented the Compensation Committee charter and executive compensation philosophy statement that the Compensation Committee had adopted in October 2013. The Board of Trustees then voted to approve them. (Def. R. 56.1 Stmt. (Dkt. No. 82) ¶¶ 31-34, 38)

Richmond states "that she did not read the Charter at the [June 24, 2014] meeting [and] does not recall being present at the meeting, and that at the meeting over twelve resolutions were adopted and eleven committees made presentations. The first time Plaintiff read the Charter was when it was produced in discovery in this litigation." (Pltf. R. 56.1 Cntrstmt. (Dkt. No. 113) ¶ 34 (citations omitted))

6.     **Richmond's Revised Employment Agreement**

On August 10, 2014, in response to a question from CEO Safyer, Jacobson emailed Safyer a link to "a Drop Box file with [Richmond's] Employment Agreement," and on August 11 emailed Safyer a summary of its terms. Safyer forwarded Jacobson's email to Richmond the same day. In her reply, Richmond stated:

I emailed him that I thought he was going to send it to you (as he said)

So he did

He is always supportive of me (as are you) and I am so appreciative

I really just wanted to the one year protection

Because one never knows what the world brings

CEO Safyer replied later that day:

One is not enough

U already have that by policy

16

(Gerson Decl., Ex. 28 (Aug. 6-11, 2014 Safyer/Richmond/Jacobson email thread) (Dkt. No. 83-28) at 2-5)

Jacobson subsequently prepared a revised employment agreement for Richmond. As relevant here, the revised agreement (1) changes the notice provision from twelve months to twenty-four months – a change that CEO Safyer had directed (Def. R. 56.1 Stmt. (Dkt. No. 82) ¶ 73); and (2) removes the mitigation provision.  The revised termination without cause provision thus reads as follows:

> Montefiore may terminate Richmond's employment at any time by giving Richmond written notice of such termination (the "Termination Notice") at least twenty four (24) months prior to the effective date of the termination.  The period commencing on the date of the Termination Notice to and including the effective date of the termination is referred to herein as the "Notice Period."

> Notwithstanding any other provision of this Agreement or any policy or guideline of Montefiore, during the Notice Period, Richmond shall continue to receive the Salary in effect on the date of the Termination Notice but shall not be entitled to participate in the Incentive Plan.  In addition, subject to applicable law, Richmond shall receive benefits at the level in effect on the date of the Termination Notice.

(Gerson Decl., Ex. 15 (Richmond Employment Agmt.) (Dkt. No. 83-15) at 23-24)

Jacobson emailed the revised employment agreement to Richmond on September 12, 2014, stating:  "Steve [Safyer] agrees with both changes."  (Def. R. 56.1 Stmt. (Dkt. No. 82) ¶¶ 69-73)  The revised employment agreement – which is dated July 1, 2014 – was subsequently signed by CEO Safyer and Richmond sometime after September 12, 2014.  (Id. ¶¶ 70-71)

Richmond states that "in part because of the favorable terms of her agreement," she disregarded overtures from several potential employers, including Planned Parenthood.  (Pltf. R. 56.1 Cntrstmt. (Dkt. No. 113) ¶¶ 222-24)[5]

---

[5]  The parties dispute whether Richmond abstained from proactively looking for another job because of the terms of her new employment agreement.  (Pltf. R. 56.1 Cntrstmt. (Dkt. No. 113) ¶ 221; Def. R. 56.1 Reply Stmt. (Dkt. No. 88) ¶ 221)

7.     **The Compensation Committee's Knowledge of Richmond's Contract**

The parties dispute when the Compensation Committee learned about Richmond's new employment agreement and, in particular, the twenty-four-month severance provision.  CEO Safyer and Jacobson attended the Compensation Committee's November and December 2014 meetings, which were the next two meetings after the new employment agreement was agreed to.  The minutes for those meetings make no mention of Richmond's new employment agreement, even though the Committee asked at the December meeting about "any additional agreements that would come before the Committee for review and approval."  At deposition, Jacobson testified that when he suggested to Safyer that they "disclose to the Compensation Committee the terms of any employment contracts," Safyer responded, "[m]ind your own business."  To Jacobson's knowledge, Richmond's new employment agreement was never disclosed to the Compensation Committee.  Indeed, Compensation Committee member Heffer testified that the Committee did not learn of Richmond's new employment agreement until October 2019, following a review of agreements Safyer had signed.  (Def. R. 56.1 Stmt. (Dkt. No. 82) ¶¶ 75-87)

Richmond notes, however, that "[f]rom 2014 to 2019, [SullivanCotter] opined that Ms. Richmond's total compensation was reasonable, and the Compensation Committee approved it."  Moreover, between 2014 and 2018, SullivanCotter made annual presentations to the Compensation Committee in which it stated that the severance provisions in Montefiore executives' contracts were reasonable.  (Pltf. R. 56.1 Stmt. (Dkt. No. 97) ¶¶ 85, 94-98)  Montefiore counters that none of these SullivanCotter presentations explicitly mentions Richmond's twenty-four-month severance provision.  (Def. R. 56.1 Cntrstmt. (Dkt. No. 105) ¶¶ 85, 94-98)

8.     **Richmond's Understanding as to Whether the Compensation Committee Had Approved Her New Employment Agreement**

At deposition, Richmond was asked repeatedly whether she believed her new employment agreement – and, in particular the twenty-four-month severance provision – required Compensation Committee approval and, if so, whether she had believed at the time that the Compensation Committee had approved this term.  During her testimony on this point, Richmond was questioned about the June 2 to June 4, 2014 email thread with Jacobson, which is quoted above.

Richmond testified that initially she "assumed the [C]ompensation [C]ommittee would approve [her] contract," because she knew it approved her salary.  After Jacobson said he would "take care of it," however, and after she received "a signed contract" – which had been "signed . . . by the CEO" – Richmond concluded that it was "a legitimate contract," and felt no need to "go and double-check" that her new employment agreement had been presented to the Compensation Committee.  Because Richmond "didn't know whether the [C]ompensation [C]ommittee had to approve it or not," she did not infer that that had necessarily occurred, and "didn't assume one thing or another."  (Richmond Dep. (Dkt. Nos. 83-1, 99-2) at 152:3-20, 157:14-160:5, 167:19-168:7,190:7-191:3, 197:4-11)

C.     **Richmond's Job Performance at Montefiore**

The parties dispute the quality of Richmond's job performance at Montefiore. There is evidence both that she was an incompetent bully, and that she was an inspiring and versatile leader.

New CEO Ozuah testified that Richmond was disorganized, a poor communicator, and a bully, and that he "concluded that she had no value to bring to [his] administration."  (Def. R. 56.1 Stmt. (Dkt. No. 82) ¶¶ 125-29, 132-33)  The Hospital has also

submitted numerous affidavits from Richmond's fellow executives and those she supervised stating that she "struggled in her role," "had poor leadership skills," was not "competent or capable of doing the job," was "extremely difficult" to work with, "did not give clear directives," "was too monotone and soft-spoken to have a commanding executive presence," was "often unapproachable, mean, and degrading," and "vacillat[ed] from detached to overbearing." (Id. ¶¶ 134-56)  In 2019, the Hospital hired outside counsel to investigate a complaint that Richmond had harassed a female direct report.  The investigation concluded that "no laws were broken," but resulted in Montefiore hiring an executive coach for Richmond.  (Id. ¶¶ 113-18)  And in 2016, Richmond told her therapist that at times she "believed she was 'not good at her job,' 'incompetent,' and 'lack[ed] leadership skills,' felt 'incapable,' and had trouble focusing and being organized."  (Id. ¶ 131 (quoting Weiner Dep. (Dkt. No. 84-13) at 75:4-76:7, 84:22-85:7, 87:20-88:19, 90:4-91:10, 122:2-15, 239:2-10; Richmond Dep. (Dkt. No. 83-1) at 257:3-23))

In a 2016 review of Richmond's compensation, however, SullivanCotter states that "the scope and diversity of her responsibilities [are] nearly unmatched when compared to similarly situated health care positions across the country."  (Pltf. R. 56.1 Cntrstmt. (Dkt. No. 113) ¶ 172)  And during her twenty-three year career at Montefiore, Richmond was repeatedly promoted, received "quite excellent" performance reviews, and received discretionary bonuses for superior job performance from 2015 through 2018.  CEO Safyer – who worked closely with Richmond for many years – testified that she did "important and excellent" work on, among other things, Montefiore's acquisitions, and that he repeatedly promoted her because of her qualifications and continued superior job performance.  Panczner – Montefiore's former general counsel – testified that he and Richmond collaborated well on multiple acquisitions, in which she played an "instrumental" role.  And while new CEO Ozuah had nothing positive to say about

Richmond at deposition, prior to this litigation he had praised Richmond's work in writing on multiple occasions.  (Id. ¶¶ 169-200)[6]

As to the 2019 investigation of a harassment allegation against Richmond, she claims that the complaint was not substantiated.  Indeed, Richmond reports "that the attorney who conducted the investigation met with her and told her there were no findings or corroboration of harassment, and if anything, her employees were eager to please her and that in her experience, female employees are usually tougher on female bosses than they are on male bosses."  Plaintiff further states "that [head of Human Resources] Cabrera told her there were no findings or corroboration of harassment by the outside investigator but he thought that it would be helpful to have an outside coach, adding that they were doing so just so it looks like Montefiore is doing something."  (Pltf. R. 56.1 Cntrstmt. (Dkt. No. 113) ¶¶ 117-18)[7]  As to Richmond's statements to her therapist about her job performance, she contends that she was describing inaccurate self-perceptions as part of a course of treatment designed in part to address this problem.  (Pltf. R. 56.1 Cntrstmt. (Dkt. No. 113) ¶ 131)

---

[6]  This Court gives no weight to those portions of Jacobson's January 25, 2023 declaration (Dkt. No. 104-4) in which he praises Richmond's job performance.  At his July 11, 2022 deposition, Jacobson testified that he "'was [not] ever involved in'" Richmond's work and therefore "'couldn't form an opinion on [her job performance].'"  (Def. Reply R. 56.1 Stmt. (Dkt. No. 88) ¶ 202 (quoting Jacobson Dep. (Dkt. No. 91-6) at 116:6-8))  See Hayes v. New York City Dep't of Corr., 84 F.3d 614, 619 (2d Cir. 1996) ("[A] party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony.").

[7]  Montefiore contends that Plaintiff cannot testify about what Montefiore's outside counsel told her, because the lawyer's statements are hearsay.  (Def. R. 56.1 Reply Stmt. (Dkt. No. 88) ¶ 280)  Defendant is mistaken.  What Montefiore's lawyer said to Richmond is an admission.  Fed. R. Evid. 801(d)(2)(D); see, e.g., United States v. Amato, 356 F.3d 216, 220 & n.3 (2d Cir. 2004) ("[A]n attorney may be the agent of his client for purposes of Rule 801(d)(2)(D).") (quotation omitted); Buxbaum v. Deutsche Bank AG, 196 F. Supp. 2d 367, 374 n.2 (S.D.N.Y. 2002) (holding that a document "prepared by . . . outside counsel in response to a [regulatory] inquiry . . . is admissible under Fed. R. Evid. 801(d)(2)(D)").

**D.**     <u>**Sexual Harassment and Sex Discrimination at Montefiore**</u>

Richmond has proffered evidence of sexual harassment and sex discrimination at Montefiore, including on the part of new CEO Ozuah, who fired her.  Plaintiff states that, <u>inter alia</u>, Dr. Ozuah kissed a female subordinate on the lips and told another she dressed like a "sorority girl."  The subordinate whom Ozuah kissed subsequently complained to Montefiore about sexual harassment and a hostile work environment, while the employee who was told she dressed like a "sorority girl" advised Human Resources that women should not be staffed to work in Ozuah's office.  (Pltf. R. 56.1 Cntrstmt. (Dkt. No. 113) ¶¶ 293-304, 328, 341)  Richmond herself received a complaint – later substantiated – from one of her female direct reports, who stated that a male executive had massaged her shoulders without her consent.  When Richmond reported the massage incident to CEO Safyer, he told her that it was the second complaint regarding such conduct Montefiore had received concerning this executive.[8]  New CEO Ozuah, who was aware of the complaints against this executive, nevertheless promoted him.  (<u>Id.</u> ¶¶ 230-37).

Richmond contends that "[i]n the last couple of years of her employment, Dr. Ozuah was always critical and demeaning toward [her]," interrupting her presentations, yelling at her, and repeatedly criticizing her in public.  Richmond perceived this conduct as motivated by her gender, because she observed Ozuah publicly criticize another female executive, but never male executives.  "Over the course of these interactions, Ms. Richmond increasingly felt she was

---

[8]  Montefiore again mistakenly asserts a hearsay objection concerning Safyer's statement.  (Def. Reply R. 56.1 Stmt. (Dkt. No. 88) ¶ 233)  Safyer's statement is an admission of Montefiore, because he made the statement while serving as the Hospital's CEO.  <u>See</u> Fed. R. Evid. 801(d)(2)(D).

working in a hostile work environment and felt diminished and denigrated by Dr. Ozuah." (Id. ¶¶ 238-47, 252 (quotation omitted))

     **E.**     <u>**"Soft Exits" at Montefiore**</u>

Plaintiff contends that Montefiore granted "soft exits" to "[n]umerous departing male executives." When a male executive's tenure was nearing its end, instead of demanding his resignation or firing him, Montefiore continued to employ the executive for several more years in a reduced role as an "advisor" or "consultant," pursuant to a new contract. Plaintiff proffers the following examples of "soft exits":

Robert Conaty, then Executive Vice President of Operations, in October 2011;

Donald Ashkenase, then Executive Vice President, in October 2013 and again in March 2016;

Joel Perlman, then Chief Financial Officer, in November 2015, and as amended in March 2016;

Stanley Jacobson, then Special Advisor for Business Affairs, in November 2017; and

Alfredo Cabrera, then Chief Human Resources Officer, in May 2020.

(Pltf. R. 56.1 Cntrstmt. (Dkt. No. 113) ¶¶ 257-64)

On July 22, 2019, Richmond sent two emails to CEO Safyer in which she (1) states that she is resigning, and (2) requests a "soft exit":

I am submitting my resignation as chief strategy officer. I will no longer submit myself to degradation by my coworkers and my trustees and not having support and confidence of leadership, including you over the past two years.

I am happy to work out a severance arrangement with you if I am able to divest of the rest of my responsibilities.

I have been subjected to the craziness between you and Phil [Ozuah] for years and have been the brunt of [Chief Financial Officer Colleen Blye's] agitation. [S]he has walked out on me, degraded me in public and yelled at me. When I have gone to her for collaboration she has balked.

I support Phil [Ozuah] and understand that he is auditioning [for the role of CEO]. But he has been not interested in participating in the executive briefings on this and he is acting like a trustee and he has not been involved. . . .

I appreciate your guidance on best next steps.  My talents and thinking are solid and have framed this.

I want to bring my skills somewhere else where I am treated with dignity and respect.

. . . .

I am sorry to write this email but it is a reflection of the depth of my feelings.  If three preceding EVPs got a transition package where they were paid without working and one SVP got and maybe still gets the same and another [SVP] got one for two years and all were men and you are saying that I can't get one because times are different, this is a problem.

(Gerson Decl., Exs. 34-35 (July 22, 2019 Richmond emails) (Dkt. Nos. 83-34, 83-35))

Richmond's employment at Montefiore continued despite her statement that she was resigning.  (Def. R. 56.1 Stmt. (Dkt. No. 82) ¶ 17)

### F.   Richmond's Termination

In mid-November 2019, CEO Safyer retired, and Ozuah replaced him as Montefiore's CEO.  Within his first week as CEO, Ozuah fired Richmond.  (Pltf. R. 56.1 Cntrstmt. (Dkt. No. 113) ¶¶ 266-67)

Before firing Richmond, Ozuah called Cabrera, the Hospital's Chief Human Resources Officer, and told him, "Let's make it hurt."  (Id. ¶¶ 268, 326)[9]

---

[9]  Montefiore objects to paragraphs 268 and 326 of Richmond's Rule 56.1 Counterstatement, which cite the deposition testimony of a Montefiore employee who overheard Ozuah's statement to Cabrera.  The Hospital contends that this statement is hearsay, and is not supported by the cited evidence, because the deponent conceded later in her deposition that it was possible Ozuah was referring to another employee he fired that same day.  (Def. Reply R. 56.1 Stmt. (Dkt. No. 88) ¶¶ 268, 326)  As to the Hospital's hearsay objection, Ozuah's statement was made in his capacity as Montefiore's CEO and is thus an admission.  Fed. R. Evid. 801(d)(2)(D).  As to the deponent's alleged conflicting testimony, that is a matter for the jury.  Accordingly, Montefiore's objections are overruled.

On November 20, 2019, Richmond was called to a meeting with Ozuah and
Cabrera, at which Ozuah fired her.  The termination was not "for cause" as defined in
Richmond's employment agreement, and Cabrera told her at the meeting that she "did nothing
wrong."  (Def. R. 56.1 Stmt. (Dkt. No. 82) ¶ 17; Pltf. R. 56.1 Cntrstmt. (Dkt. No. 113) ¶¶ 119,
267)

Richmond was given a termination letter, which reads as follows:

Dear Lynn,

This is to inform you that your employment with Montefiore Medical Center
("Montefiore") as Executive Vice President, Chief Strategy Officer is terminated
effective immediately.  Except as set forth in this letter, you will no longer be
entitled to any further compensation, monies, or other benefits from Montefiore,
including coverage under any benefits plans or programs sponsored by
Montefiore.

Additionally, the letter dated July 1, 2014 (the "Letter") is void.  The
Compensation Committee of the Montefiore Board of Trustees (the "Committee")
did not approve of either the Letter or the severance contemplated within as
required by its Charter.  The Charter charges the Committee with determining the
appropriate compensation levels for selected senior management and other highly
compensated persons who exercise a substantial influence over the affairs of
Montefiore.  In discharging these responsibilities, the Committee must ensure that
all executive compensation agreements are in compliance with applicable federal
tax and New York State law and regulations.  These include[], without limitation,
(a) 26 U.S.C. § 4958, (b) N.Y. NOT-FOR-PROFIT CORP. LAW§ 515(b), and (c)
N.Y. N.Y. NOT-FOR-PROFIT CORP. LAW § 715.  Therefore, the Charter requires
that the Committee approve compensation for certain executive positions,
including Executive Vice President, Chief Strategy Officer.  Because the
Committee did not approve the Letter outlining your compensation as Executive
Vice President, Chief Strategy Officer, the Letter is considered void.

The Board of Trustees has approved a package of six (6) months' severance pay
in consideration for your execution, non-revocation of, and compliance with the
attached Separation and Release of Claims Agreement (Separation Agreement).

(Gerson Decl., Dkt. No. 13 (Nov. 20, 2019 Richmond Termination Ltr.) (Dkt. No. 83-13) at 2)

Montefiore has not paid Richmond the 24 months' severance provided for in her
employment agreement.  (Pltf. R. 56.1 Stmt. (Dkt. No. 97) ¶ 106)

G.     **Other Actions Taken by Montefiore After Richmond's Termination**

On November 20, 2019, Montefiore also fired Jacobson.  In Jacobson's termination letter, Montefiore stated that it would not comply with the severance provision in his contract because it had not been approved by the Compensation Committee.  The parties dispute Jacobson's position at the time of his firing:  Plaintiff states that Jacobson had received a "soft exit" from his general counsel role in 2014, and was then serving as "Special Advisor for Business Affairs," while Defendant notes that Jacobson's termination letter refers to him as a "Senior Vice President."  In any event, the parties dispute Richmond's contention that she "was the only executive that Dr. Ozuah fired" shortly after taking office.  (Pltf. R. 56.1 Cntrstmt. (Dkt. No. 113) ¶¶ 273-74; Def. R. 56.1 Reply Stmt. (Dkt. No. 88) ¶¶ 273-74)

"One month after Ms. Richmond was fired, the Compensation Committee met on December 19, 2019 and purported to 'void' her Employment Agreement.  The minutes from that Compensation Committee meeting state that Ms. Richmond's Employment Agreement was voided because it was 'not duly executed by Montefiore.' . . .  At the same December 19, 2019 meeting, the Compensation Committee purported to 'void' the employment agreement of Mr. Panczner, again because the Committee claimed it was also 'not duly executed by Montefiore' . . . .  While not memorialized in any Compensation Committee meeting minutes, Montefiore also 'voided' Ms. Blye's employment agreement in 2019, which also contained a 24-month notice [provision]."  Panczner and Blye were not fired, however.  (Pltf. R. 56.1 Stmt. (Dkt. No. 97) ¶¶ 109, 112-16) (quoting Sikon Decl., Ex. 38 (Dec. 19, 2019 Board Minutes) (Dkt. No. 99-30) at 2))

II.     **PROCEDURAL HISTORY**

The Complaint was filed on October 22, 2021, and asserts claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and promissory estoppel, based on Montefiore's refusal to pay Plaintiff severance in accordance with her employment

agreement.  The Complaint also asserts gender discrimination in violation of the NYSHRL and the NYCHRL, and unlawful deductions from wages in violation of the New York Labor Law. (Dkt. No. 1)

On February 11, 2022, this Court dismissed Plaintiff's New York Labor Law and implied covenant claims pursuant to a stipulation between the parties, and in accordance with Rule 41(a)(1)(A)(ii) of the Federal Rules of Civil Procedure.  (Feb. 9, 2022 Stip. (Dkt. No. 19); Feb. 11, 2022 Order (Dkt. No. 23))

On February 21, 2023, the Hospital moved for summary judgment on Richmond's remaining claims, and Plaintiff cross-moved for summary judgment on her breach of contract claim.  (Dkt. Nos. 78, 92)

## DISCUSSION

## I.    SUMMARY JUDGMENT STANDARD

Summary judgment is warranted where the moving party "shows that there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. Cnty. of Nassau, 524 F.3d 160, 163 (2d Cir. 2008) (quoting Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir. 2007)).  "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper."  Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994) (citing Dister v. Cont'l Grp., Inc., 859 F.2d 1108, 1114 (2d Cir. 1988)).  "'[T]hat opposing parties assert competing versions of the same event is not in itself sufficient to preclude summary judgment,' in that contradictory testimony only establishes a 'genuine' issue for trial if it 'lead[s] to a different legal outcome.'"  Yi Fu Chen v.

Spring Tailor, L.L.C., No. 14 Civ. 218 (PAE), 2015 WL 3953532, at \*4 (S.D.N.Y. June 29, 2015) (alterations in original) (quoting Krynski v. Chase, 707 F. Supp. 2d 318, 322 (E.D.N.Y. 2009)).

        In deciding a summary judgment motion, the Court "'resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment.'" Spinelli v. City of New York, 579 F.3d 160, 166 (2d Cir. 2009) (quoting Brown v. Henderson, 257 F.3d 246, 251 (2d Cir. 2001)). However, "'[a] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment. . . . [M]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist.'" Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (second alteration and omissions in original) (quoting Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995)). Moreover, "'[t]he principles governing admissibility of evidence do not change on a motion for summary judgment[,]' and district courts need only consider admissible evidence in ruling on a motion for summary judgment." I.M. v. United States, 362 F. Supp. 3d 161, 174 n.9 (S.D.N.Y. 2019) (quoting Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997)).

        "The same standard[s] appl[y] where, as here, the parties file[] cross-motions for summary judgment." Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001). "[W]hen both parties move for summary judgment, asserting the absence of any genuine issues of material fact, a court need not enter judgment for either party. Rather, each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." Id. (internal citations omitted).

## II.      BREACH OF CONTRACT

It is undisputed that Richmond's termination was not "for cause" within the meaning of her employment agreement.  (Pltf. R. 56.1 Cntrstmt. (Dkt. No. 113) ¶¶ 119, 267)  It is likewise undisputed that Richmond's employment agreement provides that (1) the "Notice Period" for a not-for-cause termination is twenty-four months; and (2) "during the Notice Period, Richmond shall continue to receive the Salary in effect on the date of the Termination Notice . . . . In addition, subject to applicable law, Richmond shall receive benefits at the level in effect on the date of the Termination Notice."  (Gerson Decl., Ex. 15 (Richmond Employment Agmt.) (Dkt. No. 83-15) at 23-24)  Accordingly, under the terms of Richmond's employment agreement, Montefiore owes her twenty-four months' salary and benefits, which it has not paid.

In moving for summary judgment, Montefiore argues that "Plaintiff's breach of contract and promissory estoppel claims fail as a matter of law because the signatory or promisor" – CEO Safyer – "lacked the requisite authority" to bind Montefiore to the employment agreement.  (Def. Br. (Dkt. No. 80) at 15 (capitalization altered))  Richmond counters that Montefiore's argument that Safyer lacked authority "fails as a matter of law."  (Pltf. Br. (Dkt. No. 98) at 6)[10]

_____

[10]  Richmond also argues that "Compensation Committee Approval [of her employment agreement] was not a condition precedent."  (Pltf. Br. (Dkt. No. 98) at 15 (capitalization altered))  In opposing Plaintiff's motion for summary judgment, however, Montefiore states that it "is not 'attempt[ing] to read the condition precedent of Compensation Committee approval' into the agreement."  (Def. Opp. (Dkt. No. 102) at 15 n.5 (quoting Pltf. Br. (Dkt. No. 98) at 15; brackets in Def. Opp.))

A.      **Applicable Law**

1.      **Breach of Contract**

Under New York law,[11] the elements of a breach of contract claim are "'(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages.'" Mindspirit, LLC v. Evalueserve Ltd., 346 F. Supp. 3d 552, 574 (S.D.N.Y. 2018) (quoting Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc., 837 F. Supp. 2d 162, 188-89 (S.D.N.Y. 2011)).

"To prevail on summary judgment on a breach of contract claim, a plaintiff must: 'first, carry its burden to show that there are no genuine issues of material fact as to the existence and meaning of an agreement,' second, 'show that defendant has failed to carry its burden of production as to its affirmative defenses,' and finally, 'show that defendant, as a matter of law, breached the agreement.'" Dupler v. Berson, No. 07 CIV. 10263 SCR, 2010 WL 10827361, at *8 (S.D.N.Y. Jan. 29, 2010) (quoting Eurocredit Bank v. Citibank, N.A., No. 95 Civ. 7713, 1996 WL 556990, at *2 (S.D.N.Y. Oct. 1, 1996)). "[E]vidence of a signed written agreement between the parties, along with [evidence] reflecting the defendant's unpaid [obligations], is sufficient to establish a prima facie case for breach of contract. The burden then shifts to the defendant to provide competent evidence raising a question of material fact." AT & T Corp. v. Publ'g Concepts L.P., No. 08 CIV. 7658 (DC), 2010 WL 1191380, at *3 (S.D.N.Y. Mar. 29, 2010) (citations omitted).

---

[11]   Richmond's employment agreement contains a New York choice-of-law clause (Gerson Decl., Ex. 15 (Dkt. No. 83-15) at 27), and the parties both cite New York law. Accordingly, this Court applies New York law.

2.      **Actual and Apparent Authority**

An agent can bind a principal by virtue of the agent's actual or apparent authority to act on the principal's behalf.  See generally Rest. (3d) Agency §§ 2.01, 2.03.

"Actual authority granted to an agent to bind his principal is created by direct manifestations from the principal to the agent, and the extent of the agent's actual authority is interpreted in the light of all the circumstances attending these manifestations, including the customs of business, the subject matter, any formal agreement between the parties, and the facts of which both parties are aware."  Matter of Elizabeth T., 214 A.D.3d 815, 817 (2d Dept. 2023) (quotation omitted).

Apparent authority, by contrast, "has been defined as the 'authority which the principal holds the agent out as possessing or which he permits the agent to represent that he possesses and which the principal is estopped to deny.'"  Wen Kroy Realty Co. v. Pub. Nat. Bank & Tr. Co. of New York, 260 N.Y. 84, 92 (1932) (quoting 2 Corpus Juris. § 570). "Essential to the creation of apparent authority are words or conduct of the principal, communicated to a third party, that give rise to the appearance and belief that the agent possesses authority to enter into a transaction.  The agent cannot by his own acts imbue himself with apparent authority.  'Rather, the existence of "apparent authority" depends upon a factual showing that the third party relied upon the misrepresentation of the agent because of some misleading conduct on the part of the principal – not the agent.'  Moreover, a third party with whom the agent deals may rely on an appearance of authority only to the extent that such reliance is reasonable."  Hallock v. State, 64 N.Y.2d 224, 231 (1984) (quoting Ford v. Unity Hosp., 32 N.Y.2d 464, 473 (1973); further citation omitted).

"'It is a well-established rule . . . that the principal does not have a duty to perform[ – ]nor is he liable upon a contract[ – ]which he has not actually or apparently

authorized or ratified.'" Merex A.G. v. Fairchild Weston Sys., Inc. ("Merex I"), 810 F. Supp. 1356, 1370 (S.D.N.Y. 1993) (quoting 3 N.Y. Jur. 2d Agency § 247, at 72 (1980); ellipsis in Merex I), aff'd, 29 F.3d 821 (2d Cir. 1994) ("Merex II"), and aff'd, 54 F.3d 765 (2d Cir. 1995). "If an agent that has been charged with negotiating a contract on behalf of the principal acts outside the scope of its agency, and the opposing party knows this, then the agent lacks both actual and apparent authority, and the principal is not bound to the contract, for the contract is void – it never came into legal existence." Sphere Drake Ins. Ltd. v. Clarendon Nat. Ins. Co., 263 F.3d 26, 32 (2d Cir. 2001) (emphasis in original).

"Generally, the existence of either actual or apparent authority is a question of fact, revolving as it does around the actions by, and relationships between, principal, agent, and third parties. Thus, the existence and scope of an agency relationship can be resolved as a matter of law only if: (1) the facts are undisputed; or (2) there is but one way for a reasonable jury to interpret them." Garanti Finansal Kiralama A.S. v. Aqua Marine & Trading Inc., 697 F.3d 59, 71 (2d Cir. 2012) (citation omitted).

**B.    Analysis**

The parties dispute (1) whether CEO Safyer had actual authority to bind Montefiore to Richmond's employment agreement – i.e., whether he was required to obtain the Compensation Committee's approval for her employment agreement; and (2) whether he had apparent authority to bind Montefiore to Richmond's employment agreement – i.e., whether, based on Montefiore's actions, it was reasonable for Richmond to believe that CEO Safyer had such authority.

**1.    Actual Authority**

To prevail at summary judgment on its claim that CEO Safyer lacked actual authority to bind Montefiore in connection with Richmond's employment agreement, the

Hospital must demonstrate as a matter of law that the Compensation Committee was required to approve Richmond's employment agreement.  Conversely, for Richmond to prevail at summary judgment on her claim that Safyer had actual authority, she must demonstrate as a matter of law that Safyer had the authority to approve her employment agreement without the Compensation Committee's approval.[12]

### a.   The Actual Authority of a CEO

"There is a general presumption that the president of a corporation is clothed with the powers which, of necessity, inhere in the position of chief executive."  Odell v. 704 Broadway Condo., 284 A.D.2d 52, 56 (1st Dept. 2001); see Twyeffort v. Unexcelled Mfg. Co., 263 N.Y. 6, 9 (1933) ("'The president, having full personal charge of the business which the defendant was organized to transact, represented the corporation, and prima facie he had power to do any act which the directors could authorize or ratify.'") (quoting Hastings v. Brooklyn Life Ins. Co., 138 N.Y. 473, 479 (1893)).[13]  "Most . . . New York cases, as well as federal cases

---

[12]  Citing "annual Executive Compensation Summaries provided to the [Compensation] Committee from SullivanCotter . . . from 2014 to 2018" – in which SullivanCotter opines that Richmond's overall compensation is reasonable – Richmond contends that "the Compensation Committee was aware of [her] compensation and benefits under the employment agreement at all times."  (Pltf. R. 56.1 Cntrstmt. (Dkt. No. 113) ¶ 79 (citing Sikon Decl., Exs. 3, 31-33 (Annual Exec. Comp. Summaries) (Dkt. Nos. 99-3, 99-24 through -26)))  The materials Richmond cites as support for this assertion, however, do not (1) refer to Richmond's severance provision, or (2) list her employment agreement as a document that SullivanCotter reviewed.  Accordingly, based on the record before it, this Court cannot find that SullivanCotter and/or the Compensation Committee learned of Richmond's employment agreement and its severance provision at any point prior to October 2019.

[13]  Montefiore's bylaws provide that the "President [of Montefiore] shall be the chief executive officer of the Corporation."  (Gerson Decl., Ex. 19 (Feb. 2014 Montefiore Bylaws) (Dkt. No. 83-19) at 58)  The parties' motion papers generally refer to Safyer as the "CEO" (e.g., Def. Br. (Dkt. No. 80) at 7), while New York case law generally uses the term "president."  Because Montefiore's bylaws equate the two positions, the terms are interchangeable for purposes of the instant motion.

applying New York law, have adopted the 'ordinary business rule,'" however.  Sci. Holding Co. v. Plessey Inc., 510 F.2d 15, 24 (2d Cir. 1974) (Friendly, J.) (citing Schwartz v. United Merchant & Manufacturers, Inc., 72 F.2d 256 (2d Cir. 1934) (L. Hand, J.)).  Under this rule, "the presumption of the president's authority extends only to transactions in the ordinary course of the company's business."  Id. at 23.

The "powers which, of necessity, inhere in the position of chief executive," Odell, 284 A.D.2d at 56, include "the power to make contracts relating to the business and its operations," provided that – consistent with the ordinary business rule – "the transactions entered into by [the CEO are] within the ordinary course of [the corporation's] business."  Merrell-Benco Agency, LLC v. HSBC Bank USA, 20 A.D.3d 605, 609 (3d Dept. 2005).

In sum, "under New York law, the president of a corporation has the actual authority to 'make such ordinary contracts as custom and the necessities of business would justify or require,' unless such authority is limited by contrary provisions in the corporation's by-laws or charter or an action by the company depriving him of that authority.  'Where the president of a corporation makes a contract in the ordinary business of the corporation, the law presumes that he had the authority to do so and the burden of proving otherwise is on the party seeking to disavow the contract.'"  Alessi Equip., Inc. v. Am. Piledriving Equip., Inc., 578 F. Supp. 3d 467, 490 (S.D.N.Y. 2022) (quoting Equity Grp. v. RCM Techs., Inc., No. 84 Civ 2759 (JFK), 1986 WL 12513, at *3 (S.D.N.Y. Oct. 31, 1986)).

In determining whether a transaction is within the "ordinary business" of the corporation – and thus, presumptively within the CEO's actual authority – courts consider, inter alia, industry custom and the prior practice of the parties.  See Sci. Holding Co., 510 F.2d at 25 (actual authority to approve a contract revision without board approval "depend[ed] [in part]

upon the authority typically accorded presidents of corporations to approve at the closing

modifications of agreements"); Ullman-Briggs, Inc. v. Salton, Inc., 754 F. Supp. 1003, 1006-07

(S.D.N.Y. 1991) (after bench trial, rejecting defendant manufacturer's claim that it was not

bound by an exclusive representation contract that its president had granted to plaintiff

distributor, in part because "there was evidence, which the Court finds credible, that a two-year

written representation contract was not so unusual in the electronic appliances industry that [the

president] clearly lacked authority to make it"); Hellman v. Hellman, 60 A.D.3d 1468, 1469 (4th

Dept. 2009) (finding that fact issues precluded summary judgment on claim that defendant

president lacked authority to agree to a lease without board approval, because "[t]he record . . .

establishes that defendant previously had signed leases on behalf of the corporation").

   The parties have not cited, and this Court has not found, recent New York or

Second Circuit cases that explicitly discuss the standard for the actual authority of a CEO in the

context of employment agreements.  In two older cases, the Second Circuit states that (1) "[i]t is

generally settled that the president as part of the regular course of business has authority to hire

and discharge employees and fix their compensation," Lee v. Jenkins Bros., 268 F.2d 357, 367

(2d Cir. 1959); and (2) "an executive officer of a corporation . . . normally has the inherent

power to enter employment contracts on behalf of the corporation."  Gumpert v. Bon Ami Co.,

251 F.2d 735, 739 n.1 (2d Cir. 1958).  The Second Circuit has stated, however, that "[i]t is

questionable . . . whether a normal incident of a corporate officer's power includes hiring other

corporate officers without an express delegation of such authority from the board of directors."

Gumpert, 251 F.2d at 739 n.1.

   Goldenberg v. Bartell Broad. Corp., 47 Misc.2d 105 (N.Y. Cnty. Sup. Ct. 1965),

illustrates the application of the above principles in the context of an employment agreement.  In

Goldenberg, plaintiff employee sued to enforce a contract that had been agreed to by defendant

employer's president, pursuant to which plaintiff was to be paid – in addition to his salary –

regular monthly grants of company stock.  Defendant moved for judgment as a matter of law at

the close of plaintiff's case, arguing that plaintiff's employment agreement was invalid.

Goldenberg, 47 Misc.2d at 106-07

            In granting the defendant's motion, the Goldenberg court first found that "[t]here

ha[d] been no proof offered in this case indicating that . . . [the] president of the defendant . . .

Corporation, had express authority [from the board of directors] to enter into the agreement."  Id.

at 109.  The court then observed that "[g]enerally, the president of a corporation has the implied

authority to hire and fire corporate employees and to fix their compensation.  However the

president of a corporation does not have the implied power to execute 'unusual or extraordinary'

contracts of employment."  (Id. (emphasis in original))  In support of this rule, the court cited

cases holding that (1) "the president of a corporation did not have the implied authority to enter

into a contract of employment for life"; (2) "'it is doubtful that [a chief executive officer] would

possess power to make . . . an arrangement [to pay an employee in stock] as a normal incident of

his position'"; and (3) "'express authority'" from a company's board of directors would be

required to authorize "an employment contract under which [an employee] was to be paid . . . a

bonus based upon . . . net profits."  Id. at 109-110 (citing Heaman v. E. N. Rowell Co., 261 N.Y.

229, 231 (1933); Gumpert, 251 F.2d at 739; Noyes v. Irving Tr. Co., 250 A.D. 274, 276–77 (1st

Dept.), aff'd, 275 N.Y. 520 (1937)) (emphasis in original) (further citations omitted).  In light of

this precedent, the court concluded that "the agreement [was] within the category of being an

'unusual and extraordinary' contract," and thus outside the president's presumptive authority.

Id. at 109 (emphasis in original).

In sum, the case law demonstrates that – to determine whether CEO Safer had actual authority to approve Richmond's contract – the Court must consider (1) Montefiore's bylaws; (2) other relevant actions of Montefiore and corporate documents reflecting the scope of Safer's employment authority; and (3) whether Richmond's employment agreement contained terms that were "unusual or extraordinary."

### b.   Whether Richmond's Employment Agreement Required Compensation Committee Approval

#### i.   Montefiore's Bylaws

Plaintiff argues that Montefiore's bylaws confirm Safer's power to execute employment agreements, because they provide that "[t]he authority and responsibility of the President shall include . . . [s]electing, employing, controlling and discharging employees and developing and maintaining personnel policies and practices for the Corporation."  (Gerson Decl., Ex. 19 (Feb. 2014 Montefiore Bylaws) (Dkt. No. 83-19) at 58, 60)

In arguing that Richmond's employment agreement required Compensation Committee approval, however, the Hospital contends that "Montefiore's bylaws delegate to its Compensation Committee . . . 'authority over and responsibility for compensation policies, base salary and incentive compensation, and executive retirement and benefit plans for selected senior management.'"  (Def. Br. (Dkt. No. 80) at 10 (quoting Gerson Decl., Ex. 19 (Feb. 2014 Montefiore Bylaws) (Dkt. No. 83-19) at 52))  A reasonable jury could find that this language is a "contrary provision[] in the [Hospital's] by-laws . . . depriving [Safer] of [the] authority" over employment matters he would otherwise have held.  Alessi Equip., 578 F. Supp. 3d at 490.

Accordingly, there is a material issue of fact regarding CEO Safer's actual authority under the Hospital's bylaws.

ii.      **Other Relevant Actions and Documents**

Apart from the Hospital's bylaws, the parties focus on the Compensation Committee's charter, and related evidence about how the Committee exercised authority over executive employment agreements.  Defendant notes that the charter refers to "the Committee's process for considering and approving compensation arrangements for [Montefiore's] executives."  The charter goes on to state that "the specific duties and responsibilities of the Committee will include . . . [r]eviewing, developing and approving any changes in executive benefits and/or employment agreement/severance provisions."  (Sikon Decl., Ex. 7 (Oct. 2013 Comp. Comm. Charter) (Dkt. No. 99-4) at 21-23)[14]

While Richmond acknowledges that the charter provides that the Compensation Committee's "key responsibilities" include "[r]eviewing, developing and approving any changes in executive benefits and/or employment agreement/severance provisions," the charter also states that it is a "guide [promulgated] with the understanding that the Committee may divert from this list as appropriate given the circumstances."  (Id.)  According to Plaintiff, the "guide" reference indicates that it is not mandatory for the Compensation Committee to directly address all of its "key responsibilities."

There is also conflicting evidence as to how the Compensation Committee exercised its authority over executive employment agreements.  The Hospital argues that there is

---

[14]  Montefiore also argues that the Hospital's bylaws and the Compensation Committee's Philosophy Statement require the Compensation Committee to establish the "reasonableness" of "total compensation" in order to "protect Montefiore" – a non-profit organization – "against IRS penalties."  (Def. R. 56.1 Stmt. (Dkt. No. 82)  ¶¶ 23, 29, 35)  In this regard, the Hospital cites an IRS regulation that defines "compensation for purposes of determining reasonableness" as "includ[ing] . . . [a]ll forms of cash and noncash compensation, including salary, fees, bonuses, severance payments, and [certain] deferred and noncash compensation."  (Def. Opp. (Dkt. No. 102) at 12 (citing 26 C.F.R. § 53.4958-4(b)(1)(ii)(B))).

evidence that both Richmond and Jacobson believed that the Compensation Committee had a

role to play in approving Richmond's employment agreement.  For example, in their June 2014

email correspondence concerning Richmond's request for an employment agreement, Richmond

asked Jacobson, "What do we need to do to prepare for comp comm?" (Gerson Decl., Ex. 26

(June 2-4, 2014 Richmond/Jacobson email thread) (Dkt. No. 83-26) at 2)  Jacobson did not say

that the Compensation Committee had no role to play in connection with Richmond's

employment agreement; instead, he responded, "I will take care of Comp. Comm." (Id.)

Jacobson also suggested to CEO Safyer at some point that they "disclose to the Compensation

Committee the terms of any employment contracts." (Def. R. 56.1 Stmt. (Dkt. No. 82) ¶ 80)

As discussed above, (1) Richmond and Jacobson had long tenures as senior

Montefiore executives, and (2) Jacobson attended Compensation Committee meetings –

including the meeting at which the charter was adopted – in his capacity as general counsel and

later as "Senior Business Advisor." (Id. ¶ 47; Gerson Decl., Ex. 20 (Oct. 8, 2013 Comp. Comm.

Meeting Minutes) (Dkt. No. 84-6) at 3)  Accordingly, evidence that they believed that the

Compensation Committee was required to approve the employment agreements of senior

Montefiore executives such as Richmond, and did approve such employment agreements, must

be considered.

On the other hand, longtime Compensation Committee and Board of Trustees

member John Heffer testified that the Committee did not "approve . . . [executive employment]

agreement[s]." (Heffer Dep. (Dkt. No. 96-8) at 255:9-12)  And it is undisputed that CEO Safyer

had for years signed executive employment agreements without prior Compensation Committee

approval. (Pltf. R. 56.1 Stmt. (Dkt. No. 97) ¶¶ 42, 44-46)  Given this evidence, a reasonable jury

could infer that the charter's directive that the Compensation Committee approve all employment

agreements and, in particular, severance provisions, was never implemented, and/or was amended in practice.

In sum, there are material issues of fact as to whether CEO Safyer had actual authority to approve Richmond's employment agreement.

### iii.   Whether the Terms of Richmond's Employment Agreement Were Extraordinary

In materials submitted to the Compensation Committee, SullivanCotter stated variously that (1) Montefiore's standard severance for executives was "up to 12 months base salary and benefits," and "one year is consistent with market practice" (Gerson Decl., Ex. 6 (Oct. 2012 Richmond Reasonableness Opinion) (Dkt. No. 84-1) at 7-8 (emphasis in original)); and (2) the "[m]arket [p]ractice" for "[s]everance periods" for "senior executives [other than the CEO]" was "12 months to 24 months, with 12 months [being the] most common."  (Sikon Decl., Ex. 32 (Nov. 2014 Comp. Comm. Presentation) (Dkt. No. 99-23) at 63)  As to the Hospital's past practice, it is undisputed that CEO Safyer had signed at least one executive employment agreement – other than Richmond's – that contained a 24-month severance term.  (Pltf. R. 56.1 Stmt. (Dkt. No. 97) ¶ 44)

Given this conflicting evidence, the Court cannot determine as a matter of law whether the terms of Richmond's employment agreement were extraordinary or in the regular course of the Hospital's business.

\*       \*       \*       \*

For all these reasons, the Court concludes that there are material issues of fact as to whether CEO Safyer was required to obtain the Compensation Committee's approval for Richmond's employment agreement and twenty-four-month severance provision.  As a result,

this Court cannot resolve as a matter of law whether CEO Safyer had actual authority to bind

Montefiore to Richmond's employment agreement.

        **2.**        **Apparent Authority**

Richmond contends that CEO Safyer had apparent authority to approve her

employment agreement.  (Pltf. Br. (Dkt. No. 98) at 15-28)

        **a.**        **The Apparent Authority of a CEO**

"[A] president of a corporation has apparent authority to act within the general

scope of his office and such acts are binding on the corporation against one who does not know

of any limitation or the president's true authority."  Odell, 284 A.D.2d at 57.  Accordingly, "an

agreement entered into within the exercise of a corporate officer's apparent authority is binding

on the corporation without regard to the officer's lack of actual authority.  Even in the instance

where a chief executive's actual authority to enter into a particular agreement without the

approval of the board of directors is in doubt, no obligation is imposed on the other party to the

transaction 'to show that [the president] did, in fact, consult the board.'"  Goldston v. Bandwidth

Tech. Corp., 52 A.D.3d 360, 363 (1st Dept. 2008) (citing Odell, 284 A.D.2d at 56-57).

Although "the existence of 'apparent authority' depends upon a factual showing

that the third party relied upon the misrepresentation of the agent because of some misleading

conduct on the part of the principal – not the agent," Ford, 32 N.Y.2d at 473, "[a]n employee's

title alone can indicate such authority."  Merrill Lynch Cap. Servs., Inc. v. UISA Fin., No. 09

CIV. 2324 RJS, 2012 WL 1202034, at *18 (S.D.N.Y. Apr. 10, 2012) (citing Goldston, 52

A.D.3d at 362), aff'd, 531 F. App'x 141 (2d Cir. 2013); see Greenstone v. Glob. Computer

Corp., 77 Misc. 3d 1226(A), 180 N.Y.S.3d 895 (Suffolk Co. Ct. 2023) (considering the title in an

employee's "office email" signature as evidence of apparent authority).  As such, an agent's

"role as . . . president" may be "sufficient to establish . . . apparent authority to enter into . . .

agreement[s]." Chen v. New Trend Apparel, Inc., 8 F. Supp. 3d 406, 437 (S.D.N.Y. 2014).  See, e.g., Mindspirit, 346 F. Supp. 3d at 580 ("Vollenweider was Evalueserve's chief executive and a member of its board at the time that he signed these documents.  Vollenweider also testified that he had the authority to sign contracts on Evalueserve's behalf.  Accordingly, Vollenweider had actual – or at least apparent – authority to obligate Evalueserve to issue options to Mindspirit.") (denying defendant corporation's motion for summary judgment where CEO had authorized the issuance of notes).

As with actual authority, "[t]he president's position encompasses apparent authority to hire and fire employees and fix their compensation," Rest. (3d) Agency § 3.03 cmt. e(3), but such authority does not extend to extraordinary employment agreements.  Rather, "one entering into  . . . [an] [un]usual and [extra]ordinary . . . contract [of employment] is bound to inquire as to the agent's authority."  Noyes, 250 A.D at 276 (contract providing for compensation in defendant company's stock).  Where an employee "is not a naive person, uninitiated in the business world . . . [i]t is reasonable to infer that the plaintiff [is] aware, or at the least, ha[s] reason to be aware, that the authority for [extraordinary compensation arrangements] rests solely within the powers of the Board of Directors of the corporation, and that in the absence of express authority, the president of a corporation does not have the . . . apparent authority to enter into [such] an employment contract."  Goldenberg, 47 Misc.2d at 112-13.  Moreover, "[t]he right of a third party to rely on the apparent authority of a corporate officer [in employment matters] is subject to the condition that such third person has no notice or knowledge of a limitation on such authority."  Id. at 112.

In sum, to determine whether Richmond reasonably relied on CEO Safyer's apparent authority to execute her employment agreement, this Court must consider (1) whether

Richmond had actual knowledge of any limitation on Safyer's authority; and (2) whether the terms of her employment agreement were extraordinary so as to put her on notice of a possible limitation on his authority and trigger a duty of inquiry.

> **b.      Whether Safyer Had Apparent Authority
> to Approve Richmond's Contract**

> **i.      Richmond's Knowledge**

As to knowledge, Montefiore contends that Richmond's query to Jacobson about what they "need[ed] to do to prepare for comp comm" indicates that Richmond understood that the Compensation Committee would play a role in approving her employment agreement.  And to the extent that Jacobson assured Richmond that he would "take care of Comp. Comm.," his response tended to confirm that the Compensation Committee had a role to play in approving her employment agreement.  (Gerson Decl., Ex. 26 (June 2-4, 2014 Richmond/Jacobson email thread) (Dkt. No. 83-26) at 2)  Further, if the Compensation Committee's charter requires that it approve severance provisions in executives' contracts, Richmond may have been on notice of that requirement, because she attended a Board of Trustees meeting at which the charter was discussed.  (Def. R. 56.1 Stmt. (Dkt. No. 82) ¶ 34)

Richmond contends, however, that she did not know about any limitation on Safyer's authority.  She notes that while negotiating her employment agreement, she asked Jacobson – a lawyer and former Montefiore general counsel who attended Compensation Committee meetings and had prepared employment agreements for other Montefiore executives – what they "need[ed] to do to prepare for comp comm," and he responded that he would "take care of Comp. Comm."  (Gerson Decl., Ex. 26 (June 2-4, 2014 Richmond/Jacobson email thread) (Dkt. No. 83-26) at 2)  CEO Safyer then signed a version of the employment agreement that Richmond and Jacobson had been discussing.  No one at Montefiore raised a concern with

Plaintiff regarding the approval of her contract, and Montefiore continued to pay her and provide benefits in a manner consistent with the terms of her new employment agreement.  (Pltf. R. 56.1 Stmt. (Dkt. No. 97) ¶ 84)  See Adler v. Solar Power, Inc., No. 16 CV 1635-LTS-GWG, 2018 WL 1626162, at *7–8 (S.D.N.Y. Mar. 30, 2018) (court granted summary judgment to plaintiff employee as to restricted stock units promised as compensation in an offer letter signed by defendant employer's Chief Strategy Officer, but without board approval; because the company's "Senior Vice President of Corporate Development" had "negotiated the terms of employment with Plaintiff, sent Plaintiff an executed offer letter signed by [the Chief Strategy Officer], told him what date to affix, and congratulated Plaintiff . . . , [the Chief Strategy Officer] was imbued with apparent authority to hire him and Plaintiff was under no duty to inquire into the scope of [his] authority to the extent compensation partially through stock transfers was neither novel or extraordinary . . . [as demonstrated by] several other employment contracts, executed for [defendant] by [the Chief Strategy Officer] shortly before or after Plaintiff's, which also . . . includ[ed] provisions for the transfer of stock").

  As to the Board of Trustees meeting Richmond attended – at which the Compensation Committee's charter was discussed – she states that she did not read the charter at that time, and that numerous subjects were discussed at that meeting.  (Pltf. R. 56.1 Cntrstmt. (Dkt. No. 113) ¶ 34)

  The Court concludes that there are material issues of fact as to whether Richmond knew of limitations on CEO Safyer's authority to enter into her employment agreement.[15]

---

[15]  While Richmond testified that (1) "it was [her] thinking that the comp committee would need to approve [her] employment agreement," and (2) she did not "assume" – after it was executed – that the Compensation Committee had approved it (Richmond Dep. (Dkt. No. 83-1) at 158:8-11, 190:19-20, 197:4-11), she also testified that she "didn't know . . . for a fact" that her employment

ii.     **Whether Richmond's Contract Was Extraordinary**

As discussed above, there are material issues of fact as to whether the terms of

Richmond's employment agreement were extraordinary.  In the context of apparent authority,

however, there is an additional fact issue:  while Jacobson represented to Richmond that the

initial draft of her employment agreement was "identical to the agreements with [then Chief

Operating Officer] Phil [Ozuah] and [General Counsel] Chris [Panczner]" (Gerson Decl., Ex. 25

(June 2, 2014 Jacobson email) (Dkt. No. 83-25) at 2), there is no such evidence as to the final

version of Plaintiff's employment agreement, which increased the severance period from twelve

months to twenty-four months and removed the mitigation provision.  This Court cannot resolve

as a matter of law whether the doubling of the severance period or the removal of the mitigation

provision rendered Richmond's employment agreement "extraordinary or novel."[16]

The Court concludes that there are material issues of fact as to whether CEO

Safyer had apparent authority to enter into Richmond's employment agreement.

\*        \*        \*        \*

Having concluded that there are material issues of fact as to whether CEO Safyer

had actual or apparent authority to enter into Richmond's employment agreement on behalf of

---

agreement required Compensation Committee approval.  (Richmond Dep. (Dkt. No. 99-2) at
152:17)  Considering Richmond's testimony and the record as a whole, it is for the jury to decide
whether – as the Hospital claims – Richmond knew that "Safyer did not have the authority to
bind Montefiore to [her] contract absent Compensation Committee approval."  (Def. Br. (Dkt.
No. 80) at 8)

[16]  To the extent that Richmond argues that she reasonably assumed that Jacobson had taken
whatever steps were necessary to take with the Compensation Committee, their exchange
concerned an earlier draft of her employment agreement, and not the final version providing for
two years' severance and no mitigation obligation.  There is no evidence that Richmond took any
steps to confirm that the Compensation Committee had approved the final version of her
employment agreement.

Montefiore, the parties' cross-motions for summary judgment on Plaintiff's breach of contract claim are denied.

## III.   PROMISSORY ESTOPPEL

### A.   Applicable Law

"'Promissory estoppel is a narrow doctrine which generally only applies where there is no written contract, or where the parties' written contract is unenforceable for some reason.'" Frio Energy Partners, LLC v. Fin. Tech. Leverage, LLC, No. 22-CV-9766 (LJL), 2023 WL 4211035, at *12 (S.D.N.Y. June 27, 2023) (quoting Kortright Cap. Partners LP v. Investcorp Inv. Advisers Ltd., 257 F. Supp. 3d 348, 361 (S.D.N.Y. 2017) (internal alteration omitted). "Three elements must be satisfied to succeed on a promissory estoppel claim in New York:  (1) a clear and unambiguous promise, (2) reasonable and foreseeable reliance by the promisee, and (3) unconscionable injury to the promisee as a result of the promise. . . . The Second Circuit has defined 'unconscionable injury' as 'injury beyond that which flows naturally from the non-performance of the unenforce[d] agreement.'" Shain v. Ctr. for Jewish Hist., Inc., No. 04 CIV. 1762 (NRB), 2006 WL 3549318, at *6 (S.D.N.Y. Dec. 7, 2006) (quoting Merex II, 29 F.3d at 826) (further citation omitted; internal alteration omitted).

Lack of authority on the part of the promisor will defeat a promissory estoppel claim.  See Merex I, 810 F. Supp. at 1369; NRP Holdings LLC v. City of Buffalo, 916 F.3d 177, 202 (2d Cir. 2019).

### B.   Analysis

As an initial matter, Montefiore does not dispute that Safyer made a clear and unambiguous promise to Richmond that – if she were terminated without cause – she would be paid twenty-four months' severance.  And, as explained above, there are material issues of fact as to the validity of Richmond's employment agreement.

46

In its motion papers, Montefiore contends that "Plaintiff's promissory estoppel claim fails as a matter of law because the alleged promisor" – Safyer – "lacked authority." (Def. Br. (Dkt. No. 80) at 21 (capitalization altered))  For the reasons explained above in connection with Plaintiff's contract claim, there are material issues of fact as to Safyer's actual and apparent authority to enter into the employment agreement.  Accordingly, Montefiore is not entitled to summary judgment on that basis.

In addition to its lack of authority arguments, the Hospital asserts – in a footnote – that it is entitled to summary judgment on Richmond's promissory estoppel claim because she "cannot prove reliance" on Montefiore's promised severance.  (Def. Br. (Dkt. No. 80) at 22 n.5)  In this regard, Montefiore cites Oh v. Imagemark, Inc., No. 06 CIV. 10187 (DLC), 2007 WL 2962381 (S.D.N.Y. Oct. 10, 2007), for the proposition that "'the failure to switch employers does not create a promissory estoppel claim.'"  (Id. (quoting Oh, 2007 WL 2962381, at *4))  Oh addresses a motion to dismiss, however, as does Baguer v. Spanish Broad. Sys., No. 04-CV-8393 (KMK), 2007 WL 2780390 (S.D.N.Y. Sept. 20, 2007), the case on which Oh relies. (See Oh, 2007 WL 2962381, at *4 (citing Baguer)).  Moreover, in quoting Oh, the Hospital omits significant language:  "Under New York law, the failure to switch employers does not create a promissory estoppel claim unless the plaintiff can show that unconscionable injury would result absent enforcement of the defendant's promise."  Oh, 2007 WL 2962381, at *4 (emphasis added).  Montefiore has not briefed whether "Montefiore reneg[ing] on its promise to Ms. Richmond" and thus causing her to "suffer[] . . . the loss of the 24-month notice period" (Cmplt. (Dkt. No. 1) ¶¶ 100-01) constitutes an unconscionable injury.

In sum, Montefiore has not demonstrated that it is entitled to summary judgment on Richmond's promissory estoppel claim.  Given the material issues of fact regarding the

validity of Richmond's employment agreement and Safyer's actual and apparent authority,

Richmond may pursue her promissory estoppel claim as an alternative theory of liability.  See

York St. Mgmt., LLC v. S. Vermont Coll., No. 513CV660BKSTWD, 2016 WL 7742811, at *26

(N.D.N.Y. June 24, 2016) (denying summary judgment as to promissory estoppel claim where

there were material issues of fact as to whether a contract was void for lack of authorization).

## IV.   NYSHRL AND NYCHRL DISCRIMINATION CLAIMS

Richmond claims that "Montefiore discriminated against [her] by terminating her

employment but not that of her similarly situated male peers," and "by immediately terminating

her employment and not offering her a 'soft' exit or a 'glidepath' like her male peers."  (Cmplt.

(Dkt. No. 1) ¶¶ 78-79)

### A.   Applicable Law

#### 1.   Statutes

The NYSHRL provides that

[i]t shall be an unlawful discriminatory practice . . . [f]or an employer . . . ,
because of an individual's . . . sex . . . to refuse to hire or employ or to bar or to
discharge from employment such individual or to discriminate against such
individual in compensation or in terms, conditions or privileges of employment.

N.Y. Exec. Law § 296(1)(a).

The NYCHRL provides that

[i]t shall be an unlawful discriminatory practice . . . [f]or an employer or an
employee or agent thereof, because of the actual or perceived . . . gender . . . of
any person . . . [t]o refuse to hire or employ or to bar or to discharge from
employment such person; or . . . [t]o discriminate against such person in
compensation or in terms, conditions, or privileges of employment.

N.Y.C. Admin. Code § 8-107(1)(a)(2)-(3).

Pursuant to legislation passed in 2019, <u>see</u> S. 6577, 242d Leg. § 16(d) (N.Y. 2019), the NYSHRL and the NYCHRL now have nearly identical liberal construction provisions:

- N.Y. Exec. Law § 300: "The provisions of this article shall be construed liberally for the accomplishment of the remedial purposes thereof, regardless of whether federal civil rights laws, including those laws with provisions worded comparably to the provisions of this article, have been so construed. Exceptions to and exemptions from the provisions of this article shall be construed narrowly in order to maximize deterrence of discriminatory conduct."

- N.Y.C. Admin. Code § 8-130(a)-(b): "The provisions of this title shall be construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof, regardless of whether federal or New York state civil and human rights laws, including those laws with provisions worded comparably to provisions of this title, have been so construed. . . . Exceptions to and exemptions from the provisions of this title shall be construed narrowly in order to maximize deterrence of discriminatory conduct."

The NYSHRL's liberal construction provision applies to claims that accrued after either August 12 or October 11, 2019, depending on which step of the legislative process is viewed as conclusive. <u>Compare</u> <u>McHenry v. Fox News Network, LLC</u>, 510 F. Supp. 3d 51, 68 (S.D.N.Y. 2020) (applying August 2019 date) <u>with</u> <u>Livingston v. City of New York</u>, 563 F. Supp. 3d 201, 232 n.14 (S.D.N.Y. 2021) (applying October 2019 date). Here, Plaintiff's claims accrued upon her firing in November 2019. Accordingly, the liberal construction provision of the NYSHRL applies to Plaintiff's claims.

Given the nearly identical language of the NYSHRL and NYCHRL liberal construction provisions, <u>see</u> <u>Hosking v. Mem'l Sloan-Kettering Cancer Ctr.</u>, 186 A.D.3d 58, 64 n.1 (1st Dept. 2020) (noting that the two liberal construction provisions are "remarkably similar"), this Court concludes that NYSHRL discrimination claims are now subject to the more liberal standards of the NYCHRL. <u>See</u> <u>Syeed v. Bloomberg L.P.</u>, No. 1:20-CV-7464-GHW, 2022 WL 3447987, at *6 (S.D.N.Y. Aug. 17, 2022) ("[T]he standard for NYSHRL [claims] aligns with the NYCHRL standard for claims that accrued on or after October 11, 2019."),

reconsideration <u>partially</u> <u>granted</u> <u>on</u> <u>other</u> <u>grounds</u> <u>sub</u> <u>nom.</u> <u>Ndugga v. Bloomberg L.P.</u>, No.

1:20-CV-7464-GHW, 2023 WL 4744183 (S.D.N.Y. July 25, 2023).[17]  Under the NYCHRL

standard, this Court is required to "constru[e] [the statutes'] provisions 'broadly in favor of

discrimination plaintiffs, to the extent that such a construction is reasonably possible.'"  <u>Mihalik</u>

<u>v. Credit Agricole Cheuvreux N. Am., Inc.</u>, 715 F.3d 102, 109 (2d Cir. 2013) (quoting <u>Albunio</u>

<u>v. City of New York</u>, 16 N.Y.3d 472, 477-78 (2011)).

### 2.  Burden-Shifting Framework

New York courts considering NYCHRL claims on summary judgment have adopted a modified version of the burden-shifting analysis set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).  Under the [modified] framework, a plaintiff must first make a <u>prima</u> <u>facie</u> showing of membership in a protected class and an adverse employment action under circumstances giving rise to an inference of discrimination.  Plaintiff's burden to show a <u>prima</u> <u>facie</u> case at the summary judgment stage is minimal. . . . [I]n the <u>prima</u> <u>facie</u> case inquiry, [a court] should ask only "whether the initial facts described by the plaintiff, <u>if not otherwise explained</u>, give rise to the <u>McDonnell Douglas</u> inference of discrimination."

Following that minimal showing, a burden of production shifts to the defendant to "put forward evidence of one or more non-discriminatory motivations for its actions."

If the [d]efendant makes that showing, "the court should turn to the question of whether the defendant has sufficiently met its initial burden as the moving party of showing that there is no evidentiary route that could allow a jury to believe that discrimination played a role in the challenged action."  Summary judgment is appropriate only if "no jury could find defendant liable under any of the evidentiary routes – <u>McDonnell Douglas</u>, mixed motive, 'direct' evidence, or some combination thereof."  "If the plaintiff responds with some evidence that at least one of the reasons proffered by defendant is false, misleading, or incomplete, a host of determinations properly made only by a jury come into play, and thus such evidence of pretext should in almost every case indicate to the court that a motion for summary judgment must be denied."  In essence, "under the

---

[17]  The Hospital argues that "while the NYSHRL amendment directs a liberal construction, it does not make the NYSHRL and NYCHRL standards the same."  (Def. Reply Br. (Dkt. No. 86) at 9 n.9)  But the Hospital makes no effort to explain how the standards under the two statutes differ.

NYCHRL, unlawful discrimination must play 'no role' in an employment decision."

Edelman v. NYU Langone Health Sys., No. 21 CIV. 502 (LGS), 2022 WL 4537972, at *13 (S.D.N.Y. Sept. 28, 2022) (quoting Bennett v. Health Mgmt. Sys., 92 A.D.3d 29, 35-39 (1st Dept. 2011) (emphasis in Bennett); and Lefort v. Kingsbrook Jewish Med. Ctr., 203 A.D.3d 708 (2d Dept. 2022)) (internal alterations omitted)); see also Ya-Chen Chen v. City Univ. of New York, 805 F.3d 59, 76 (2d Cir. 2015) ("summary judgment is appropriate if 'the record establishes as a matter of law' that discrimination or retaliation 'play[ed] no role' in the defendant's actions") (quoting Mihalik, 715 F.3d at 110 n. 8; brackets in Ya-Chen Chen).

    **B.**      **Analysis**

        **1.**      **Richmond's *Prima Facie* Case**

Plaintiff has proffered examples of numerous male senior executives at Montefiore who received "soft exits" rather than being terminated. (Pltf. R. 56.1 Cntrstmt. (Dkt. No. 113) ¶¶ 257-64) She has also proffered evidence that she "was the only executive that Dr. Ozuah fired" shortly after assuming the CEO position. (Id. ¶¶ 273-74) And she has also proffered evidence of sexist conduct by CEO Ozuah. (Id. ¶¶ 293-304, 328, 341) Plaintiff has thus satisfied her "minimal" burden at the prima facie stage to proffer facts that, "'if not otherwise explained, give rise to the McDonnell Douglas inference of discrimination.'" Edelman, 2022 WL 4537972, at *13 (quoting Bennett, 92 A.D.3d at 39) (emphasis in Bennett).

The Hospital contends, however, that "Plaintiff cannot make out a prima facie case under the NYCHRL [or the NYSHRL] because there is no evidence that gender played any role in her termination." (Def. Br. (Dkt. No. 80) at 23 (capitalization altered)) In this regard, the Hospital asserts that (1) "Dr. Ozuah fired a male executive on the same day and in the same manner he fired Plaintiff, and he retained other female executives"; (2) "Plaintiff cannot satisfy

her burden of demonstrating that the identified male colleagues were similarly situated to her in all material respects"; and (3) "Plaintiff's additional allegations do not support an inference of discriminatory motive." (Id. at 23-29 (capitalization altered))  Defendant's arguments are not persuasive.

As to the firing of a male executive, the Hospital is referring to Stanley Jacobson. Jacobson – the Hospital's former general counsel – had previously received a "soft exit," however.  After stepping down from his general counsel position, he was permitted to serve as "Senior Business Advisor."  In sum, construing the facts in the light most favorable to Plaintiff, Jacobson was not similarly situated to Richmond.  (Pltf. R. 56.1 Cntrstmt. (Dkt. No. 113) ¶¶ 273-74)

As to whether Richmond was similarly situated to her male comparators who received "soft exits," the Hospital argues that she was terminated by a different supervisor than most of her comparators, and had unique performance issues, including a harassment complaint against her.  (Def. Br. (Dkt. No. 80) at 25-27)  In arguing that Richmond has therefore not made out a prima facie case, Defendant relies on cases applying the Title VII standard.  See Shumway v. United Parcel Serv., Inc., 118 F.3d 60, 63 (2d Cir. 1997) ("Shumway was left with only the Title VII sex discrimination claim against UPS."); Canales-Jacobs v. New York State Off. of Ct. Admin., 640 F. Supp. 2d 482, 499, 504-05 (S.D.N.Y. 2009) (reaching the merits of only plaintiff's Section 1981 claim); Ruiz v. Cnty. of Rockland, 609 F.3d 486, 488-89 (2d Cir. 2010) (Title VII, Section 1981, and Section 1983 claims).[18]

---

[18] White v. Pacifica Found., 973 F. Supp. 2d 363 (S.D.N.Y. 2013), cited by the Hospital (Def. Br. (Dkt. No. 80) at 23), does not support Defendant's argument that Plaintiff has failed to make out a prima facie case.  In White, this Court ruled that an allegedly racist email sent by a board member who was not involved in terminating plaintiff could not be relied on to demonstrate discriminatory animus on the part of supervisors who were.  See id. at 380.

In contrast to the analysis required under Title VII, however, "the Court 'need not tarry over the question of whether the plaintiff has made out a prima facie case' under the NYCHRL [and NYSHRL]."  Marseille v. Mount Sinai Health Sys., No. 18-CV-12136 (VEC), 2021 WL 3475620, at *7 (S.D.N.Y. Aug. 5, 2021) (quoting Campbell v. Cellco P'ship, 860 F. Supp. 2d 284, 299 (S.D.N.Y. 2012)), aff'd sub nom. Marseille v. Mount Sinai Hosp., No. 21-2140, 2022 WL 14700981 (2d Cir. Oct. 26, 2022).  As the court in Bennett v. Health Mgmt. Sys., 92 A.D.3d 29, 35-39 (1st Dept. 2011) explained, an employer's

> explanatory second set of facts, such as the absence of . . . misconduct by the plaintiff's colleagues, should not be relied on to negate the plaintiff's prima facie case in the first instance, but rather, seen as either:  (a) the defendant's articulation through competent evidence of non-discriminatory reasons for its action (stage two in the McDonnell Douglas framework); or (b) part of the defendant's ultimate effort to undercut the weight assigned to the plaintiff's evidence and thus disprove the plaintiff's claim that it was more likely than not that discrimination played a role in defendant's actions. . . . A defendant's production of evidence supporting its position that it acted for non-discriminatory reasons does not mean that a prima facie case had not been created in the first instance, and courts should not treat such evidence as doing so.

Bennett, 92 A.D.3d at 37; see N.Y.C. Admin. Code § 8-130(c) (citing Bennett as a "[c]ase[] that ha[s] correctly understood and analyzed the [NYCHRL's] liberal construction requirement").

Moreover, Plaintiff's evidence that CEO Ozuah treated other women in a sexist manner can be considered in determining whether the circumstances of Plaintiff's firing give rise to an inference of discriminatory intent.  See Zubulake v. UBS Warburg LLC., 382 F. Supp. 2d 536, 544 (S.D.N.Y. 2005) ("'As a general rule, the testimony of other employees about their treatment by the defendant is relevant to the issue of the employer's discriminatory intent.'") (quoting Spulak v. K Mart Corp., 894 F.2d 1150, 1156 (10th Cir.1990)).

In sum, Plaintiff has made out a prima facie case of gender discrimination.

>     **2.     Whether Montefiore Fired Richmond for**
>             **Legitimate, Non-Discriminatory Reasons**

The Hospital has proffered evidence of legitimate, non-discriminatory reasons for terminating Plaintiff, including her poor work performance and practice of bullying subordinates. (Def. R. 56.1 Stmt. (Dkt. No. 82) ¶¶ 113-18, 125-29, 132-56)

Richmond has proffered evidence that the Hospital's alleged legitimate reasons for terminating her employment are pretextual, however, including her long and successful career at Montefiore, her record of repeated promotions, excellent performance reviews and bonuses, the "scope and diversity of her responsibilities" at the Hospital, and her "instrumental" role in the Hospital's acquisition strategy. Richmond also cites (1) the statement from Alfredo Cabrera, Montefiore's head of Human Resources, at the time of her termination, that Richmond "did nothing wrong"; and (2) evidence that Ozuah said "let's make it hurt" in directing that Richmond be fired. (Pltf. R. 56.1 Cntrstmt. (Dkt. No. 113) ¶¶ 119, 169-200, 219-20, 267-68, 326) "Once there is some evidence that at least one of the reasons proffered by defendant is false, misleading, or incomplete, a host of determinations properly made only by a jury come into play, such as whether a false explanation constitutes evidence of consciousness of guilt, an attempt to cover up the alleged discriminatory conduct, or an improper discriminatory motive co-existing with other legitimate reasons. These will be jury questions except in the most extreme and unusual circumstances." Bennett, 92 A.D.3d at 43.

In sum, although Montefiore has proffered a legitimate basis for its decision to fire Richmond, it has not demonstrated as a matter of law that gender animus "play[ed] no role" in that decision. Mihalik, 715 F.3d at 110 n.8. Accordingly, Montefiore is not entitled to summary judgment on Richmond's NYSHRL and NYCHRL discrimination claims.

## CONCLUSION

For the reasons stated above, the parties' motions for summary judgment (Dkt.

Nos. 78, 92) are denied.

Dated: New York, New York
       September 25, 2023

SO ORDERED.

Paul G. Gardephe
United States District Judge